# PARKLANE HOSIERY CO., INC., ET AL. v. SHORE

No. 77-1305.   Argued October 30, 1978—Decided January 9, 1979

STEWART, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, WHITE, MARSHALL, BLACKMUN, POWELL, and STEVENS, JJ., joined. REHNQUIST, J., filed a dissenting opinion, *post,* p. 337.

*Jack B. Levitt* argued the cause for petitioners. With him on the briefs were *Irving Parker, Joseph N. Salomon,* and *Robert N. Cooperman.*

*Samuel K. Rosen* argued the cause and filed a brief for respondent.*

*Solicitor General McCree, Deputy Solicitor General Easterbrook, Stephen M. Shapiro, Harvey L. Pitt, Paul Gonson,* and *Michael K. Wolen-*

Mr. Justice Stewart delivered the opinion of the Court.

This case presents the question whether a party who has had issues of fact adjudicated adversely to it in an equitable action may be collaterally estopped from relitigating the same issues before a jury in a subsequent legal action brought against it by a new party.

The respondent brought this stockholder's class action against the petitioners in a Federal District Court. The complaint alleged that the petitioners, Parklane Hosiery Co., Inc. (Parklane), and 13 of its officers, directors, and stockholders, had issued a materially false and misleading proxy statement in connection with a merger.[1] The proxy statement, according to the complaint, had violated §§ 14 (a), 10 (b), and 20 (a) of the Securities Exchange Act of 1934, 48 Stat. 895, 891, 899, as amended, 15 U. S. C. §§ 78n (a), 78j (b), and 78t (a), as well as various rules and regulations promulgated by the Securities and Exchange Commission (SEC). The complaint sought damages, rescission of the merger, and recovery of costs.

Before this action came to trial, the SEC filed suit against the same defendants in the Federal District Court, alleging that the proxy statement that had been issued by Parklane was materially false and misleading in essentially the same respects as those that had been alleged in the respondent's complaint. Injunctive relief was requested. After a 4-day

---

*sky* filed a brief for the United States et al. as *amici curiae* urging affirmance.

*Joel D. Joseph* filed a brief for the Washington Legal Foundation as *amicus curiae*.

[1] The amended complaint alleged that the proxy statement that had been issued to the stockholders was false and misleading because it failed to disclose: (1) that the president of Parklane would financially benefit as a result of the company's going private; (2) certain ongoing negotiations that could have resulted in financial benefit to Parklane; and (3) that the appraisal of the fair value of Parklane stock was based on insufficient information to be accurate.

trial, the District Court found that the proxy statement was materially false and misleading in the respects alleged, and entered a declaratory judgment to that effect. *SEC v. Parklane Hosiery Co.*, 422 F. Supp. 477. The Court of Appeals for the Second Circuit affirmed this judgment. 558 F. 2d 1083.

The respondent in the present case then moved for partial summary judgment against the petitioners, asserting that the petitioners were collaterally estopped from relitigating the issues that had been resolved against them in the action brought by the SEC.[2] The District Court denied the motion on the ground that such an application of collateral estoppel would deny the petitioners their Seventh Amendment right to a jury trial. The Court of Appeals for the Second Circuit reversed, holding that a party who has had issues of fact determined against him after a full and fair opportunity to litigate in a nonjury trial is collaterally estopped from obtaining a subsequent jury trial of these same issues of fact. 565 F. 2d 815. The appellate court concluded that "the Seventh Amendment preserves the right to jury trial only with respect to issues of fact, [and] once those issues have been fully and fairly adjudicated in a prior proceeding, nothing remains for trial, either with or without a jury." *Id.*, at 819. Because of an intercircuit conflict,[3] we granted certiorari. 435 U. S. 1006.

---

[2] A private plaintiff in an action under the proxy rules is not entitled to relief simply by demonstrating that the proxy solicitation was materially false and misleading. The plaintiff must also show that he was injured and prove damages. *Mills* v. *Electric Auto-Lite Co.*, 396 U. S. 375, 386–390. Since the SEC action was limited to a determination of whether the proxy statement contained materially false and misleading information, the respondent conceded that he would still have to prove these other elements of his prima facie case in the private action. The petitioners' right to a jury trial on those remaining issues is not contested.

[3] The position of the Court of Appeals for the Second Circuit is in conflict with that taken by the Court of Appeals for the Fifth Circuit in *Rachal* v. *Hill*, 435 F. 2d 59.

## I

The threshold question to be considered is whether, quite apart from the right to a jury trial under the Seventh Amendment, the petitioners can be precluded from relitigating facts resolved adversely to them in a prior equitable proceeding with another party under the general law of collateral estoppel. Specifically, we must determine whether a litigant who was not a party to a prior judgment may nevertheless use that judgment "offensively" to prevent a defendant from relitigating issues resolved in the earlier proceeding.[4]

## A

Collateral estoppel, like the related doctrine of res judicata,[5] has the dual purpose of protecting litigants from the burden of relitigating an identical issue with the same party or his privy and of promoting judicial economy by preventing needless litigation. *Blonder-Tongue Laboratories, Inc.* v. *University of Illinois Foundation,* 402 U. S. 313, 328–329. Until relatively recently, however, the scope of collateral estoppel was limited by the doctrine of mutuality of parties. Under this mutuality doctrine, neither party could use a prior judg-

---

[4] In this context, offensive use of collateral estoppel occurs when the plaintiff seeks to foreclose the defendant from litigating an issue the defendant has previously litigated unsuccessfully in an action with another party. Defensive use occurs when a defendant seeks to prevent a plaintiff from asserting a claim the plaintiff has previously litigated and lost against another defendant.

[5] Under the doctrine of res judicata, a judgment on the merits in a prior suit bars a second suit involving the same parties or their privies based on the same cause of action. Under the doctrine of collateral estoppel, on the other hand, the second action is upon a different cause of action and the judgment in the prior suit precludes relitigation of issues actually litigated and necessary to the outcome of the first action. 1B J. Moore, Federal Practice ¶ 0.405 [1], pp. 622–624 (2d ed. 1974); *e. g., Lawlor* v. *National Screen Serv. Corp.,* 349 U. S. 322, 326; *Commissioner* v. *Sunnen,* 333 U. S. 591, 597; *Cromwell* v. *County of Sac,* 94 U. S. 351, 352–353.

ment as an estoppel against the other unless both parties were bound by the judgment.[6] Based on the premise that it is somehow unfair to allow a party to use a prior judgment when he himself would not be so bound,[7] the mutuality requirement provided a party who had litigated and lost in a previous action an opportunity to relitigate identical issues with new parties.

By failing to recognize the obvious difference in position between a party who has never litigated an issue and one who has fully litigated and lost, the mutuality requirement was criticized almost from its inception.[8] Recognizing the validity of this criticism, the Court in *Blonder-Tongue Laboratories, Inc.* v. *University of Illinois Foundation, supra,* abandoned the mutuality requirement, at least in cases where a patentee seeks to relitigate the validity of a patent after a federal court in a previous lawsuit has already declared it invalid.[9] The

---

[6] *E. g., Bigelow* v. *Old Dominion Copper Co.,* 225 U. S. 111, 127 ("It is a principle of general elementary law that estoppel of a judgment must be mutual"); *Buckeye Powder Co.* v. *E. I. DuPont de Nemours Powder Co.,* 248 U. S. 55, 63; Restatement of Judgments § 93 (1942).

[7] It is a violation of due process for a judgment to be binding on a litigant who was not a party or a privy and therefore has never had an opportunity to be heard. *Blonder-Tongue Laboratories, Inc.* v. *University of Illinois Foundation,* 402 U. S. 313, 329; *Hansberry* v. *Lee,* 311 U. S. 32, 40.

[8] This criticism was summarized in the Court's opinion in *Blonder-Tongue Laboratories, Inc.* v. *University of Illinois Foundation, supra,* at 332–327. The opinion of Justice Traynor for a unanimous California Supreme Court in *Bernhard* v. *Bank of America Nat. Trust & Savings Assn.,* 19 Cal. 2d 807, 812, 122 P. 2d 892, 895, made the point succinctly: "No satisfactory rationalization has been advanced for the requirement of mutuality. Just why a party who was not bound by a previous action should be precluded from asserting it as res judicata against a party who was bound by it is difficult to comprehend."

[9] In *Triplett* v. *Lowell,* 297 U. S. 638, the Court had held that a determination of patent invalidity in a prior action did not bar a plaintiff from

"broader question" before the Court, however, was "whether it is any longer tenable to afford a litigant more than one full and fair opportunity for judicial resolution of the same issue." 402 U. S., at 328. The Court strongly suggested a negative answer to that question:

"In any lawsuit where a defendant, because of the mutuality principle, is forced to present a complete defense on the merits to a claim which the plaintiff has fully litigated and lost in a prior action, there is an arguable misallocation of resources. To the extent the defendant in the second suit may not win by asserting, without contradiction, that the plaintiff had fully and fairly, but unsuccessfully, litigated the same claim in the prior suit, the defendant's time and money are diverted from alternative uses—productive or otherwise—to relitigation of a decided issue. And, still assuming that the issue was resolved correctly in the first suit, there is reason to be concerned about the plaintiff's allocation of resources. Permitting repeated litigation of the same issue as long as the supply of unrelated defendants holds out reflects either the aura of the gaming table or 'a lack of discipline and of disinterestedness on the part of the lower courts, hardly a worthy or wise basis for fashioning rules of procedure.' *Kerotest Mfg. Co.* v. *C-O-Two Co.*, 342 U. S. 180, 185 (1952). Although neither judges, the parties, nor the adversary system performs perfectly in all cases, the requirement of determining whether the party against whom an estoppel is asserted had a full and fair opportunity to litigate is a most significant safeguard." *Id.*, at 329.[10]

---

relitigating the validity of a patent in a subsequent action against a different defendant. This holding of the *Triplett* case was explicitly overruled in the *Blonder-Tongue* case.

[10] The Court also emphasized that relitigation of issues previously adjudicated is particularly wasteful in patent cases because of their stag-

## B

The *Blonder-Tongue* case involved defensive use of collateral estoppel—a plaintiff was estopped from asserting a claim that the plaintiff had previously litigated and lost against another defendant. The present case, by contrast, involves offensive use of collateral estoppel—a plaintiff is seeking to estop a defendant from relitigating the issues which the defendant previously litigated and lost against another plaintiff. In both the offensive and defensive use situations, the party against whom estoppel is asserted has litigated and lost in an earlier action. Nevertheless, several reasons have been advanced why the two situations should be treated differently.[11]

First, offensive use of collateral estoppel does not promote judicial economy in the same manner as defensive use does. Defensive use of collateral estoppel precludes a plaintiff from relitigating identical issues by merely "switching adversaries." *Bernhard* v. *Bank of America Nat. Trust & Savings Assn.,* 19 Cal. 2d, at 813, 122 P. 2d, at 895.[12] Thus defensive collateral estoppel gives a plaintiff a strong incentive to join

gering expense and typical length. 402 U. S., at 334, 348. Under the doctrine of mutuality of parties an alleged infringer might find it cheaper to pay royalties than to challenge a patent that had been declared invalid in a prior suit, since the holder of the patent is entitled to a statutory presumption of validity. *Id.,* at 338.

[11] Various commentators have expressed reservations regarding the application of offensive collateral estoppel. Currie, Mutuality of Estoppel: Limits of the *Bernhard* Doctrine, 9 Stan. L. Rev. 281 (1957); Semmel, Collateral Estoppel, Mutuality and Joinder of Parties, 68 Colum. L. Rev. 1457 (1968); Note, The Impacts of Defensive and Offensive Assertion of Collateral Estoppel by a Nonparty, 35 Geo. Wash. L. Rev. 1010 (1967). Professor Currie later tempered his reservations. Civil Procedure: 'The Tempest Brews, 53 Calif. L. Rev. 25 (1965).

[12] Under the mutuality requirement, a plaintiff could accomplish this result since he would not have been bound by the judgment had the original defendant won.

all potential defendants in the first action if possible. Offensive use of collateral estoppel, on the other hand, creates precisely the opposite incentive. Since a plaintiff will be able to rely on a previous judgment against a defendant but will not be bound by that judgment if the defendant wins, the plaintiff has every incentive to adopt a "wait and see" attitude, in the hope that the first action by another plaintiff will result in a favorable judgment. *E. g., Nevarov* v. *Caldwell,* 161 Cal. App. 2d 762, 767–768, 327 P. 2d 111, 115; *Reardon* v. *Allen,* 88 N. J. Super. 560, 571–572, 213 A. 2d 26, 32. Thus offensive use of collateral estoppel will likely increase rather than decrease the total amount of litigation, since potential plaintiffs will have everything to gain and nothing to lose by not intervening in the first action.[18]

A second argument against offensive use of collateral estoppel is that it may be unfair to a defendant. If a defendant in the first action is sued for small or nominal damages, he may have little incentive to defend vigorously, particularly if future suits are not foreseeable. *The Evergreens* v. *Nunan,* 141 F. 2d 927, 929 (CA2); cf. *Berner* v. *British Commonwealth Pac. Airlines,* 346 F. 2d 532 (CA2) (application of offensive collateral estoppel denied where defendant did not appeal an adverse judgment awarding damages of $35,000 and defendant was later sued for over $7 million). Allowing offensive collateral estoppel may also be unfair to a defendant if the judgment relied upon as a basis for the estoppel is itself inconsistent with one or more previous judgments in favor of the defendant.[14] Still another situation where it might be

---

[18] The Restatement (Second) of Judgments § 88 (3) (Tent. Draft No. 2, Apr. 15, 1975) provides that application of collateral estoppel may be denied if the party asserting it "could have effected joinder in the first action between himself and his present adversary."

[14] In Professor Currie's familiar example, a railroad collision injures 50 passengers all of whom bring separate actions against the railroad. After the railroad wins the first 25 suits, a plaintiff wins in suit 26. Professor Currie argues that offensive use of collateral estoppel should not

unfair to apply offensive estoppel is where the second action affords the defendant procedural opportunities unavailable in the first action that could readily cause a different result.[15]

## C

We have concluded that the preferable approach for dealing with these problems in the federal courts is not to preclude the use of offensive collateral estoppel, but to grant trial courts broad discretion to determine when it should be applied.[16] The general rule should be that in cases where a plaintiff could easily have joined in the earlier action or where, either for the reasons discussed above or for other reasons, the application of offensive estoppel would be unfair to a defendant, a trial judge should not allow the use of offensive collateral estoppel.

In the present case, however, none of the circumstances that might justify reluctance to allow the offensive use of collateral estoppel is present. The application of offensive collateral

---

be applied so as to allow plaintiffs 27 through 50 automatically to recover. Currie, *supra*, 9 Stan. L. Rev., at 304. See Restatement (Second) of Judgments § 88 (4), *supra*.

[15] If, for example, the defendant in the first action was forced to defend in an inconvenient forum and therefore was unable to engage in full scale discovery or call witnesses, application of offensive collateral estoppel may be unwarranted. Indeed, differences in available procedures may sometimes justify not allowing a prior judgment to have estoppel effect in a subsequent action even between the same parties, or where defensive estoppel is asserted against a plaintiff who has litigated and lost. The problem of unfairness is particularly acute in cases of offensive estoppel, however, because the defendant against whom estoppel is asserted typically will not have chosen the forum in the first action. See, *id.*, § 88 (2) and Comment *d*.

[16] This is essentially the approach of *id.*, § 88, which recognizes that "the distinct trend if not the clear weight of recent authority is to the effect that there is no intrinsic difference between 'offensive' as distinct from 'defensive' issue preclusion, although a stronger showing that the prior opportunity to litigate was adequate may be required in the former situation than the latter." *Id.*, Reporter's Note, at 99.

estoppel will not here reward a private plaintiff who could have joined in the previous action, since the respondent probably could not have joined in the injunctive action brought by the SEC even had he so desired.[17] Similarly, there is no unfairness to the petitioners in applying offensive collateral estoppel in this case. First, in light of the serious allegations made in the SEC's complaint against the petitioners, as well as the foreseeability of subsequent private suits that typically follow a successful Government judgment, the petitioners had every incentive to litigate the SEC lawsuit fully and vigorously.[18] Second, the judgment in the SEC action was not inconsistent with any previous decision. Finally, there will in the respondent's action be no procedural opportunities available to the petitioners that were unavailable in the first action of a kind that might be likely to cause a different result.[19]

We conclude, therefore, that none of the considerations that would justify a refusal to allow the use of offensive collateral estoppel is present in this case. Since the petitioners received a "full and fair" opportunity to litigate their claims in the

---

[17] *SEC* v. *Everest Management Corp.*, 475 F. 2d 1236, 1240 (CA2) ("[T]he complicating effect of the additional issues and the additional parties outweighs any advantage of a single disposition of the common issues"). Moreover, consolidation of a private action with one brought by the SEC without its consent is prohibited by statute. 15 U. S. C. § 78u (g).

[18] After a 4-day trial in which the petitioners had every opportunity to present evidence and call witnesses, the District Court held for the SEC. The petitioners then appealed to the Court of Appeals for the Second Circuit, which affirmed the judgment against them. Moreover, the petitioners were already aware of the action brought by the respondent, since it had commenced before the filing of the SEC action.

[19] It is true, of course, that the petitioners in the present action would be entitled to a jury trial of the issues bearing on whether the proxy statement was materially false and misleading had the SEC action never been brought—a matter to be discussed in Part II of this opinion. But the presence or absence of a jury as factfinder is basically neutral, quite unlike, for example, the necessity of defending the first lawsuit in an inconvenient forum.

SEC action, the contemporary law of collateral estoppel leads inescapably to the conclusion that the petitioners are collaterally estopped from relitigating the question of whether the proxy statement was materially false and misleading.

## II

The question that remains is whether, notwithstanding the law of collateral estoppel, the use of offensive collateral estoppel in this case would violate the petitioners' Seventh Amendment right to a jury trial.[20]

### A

"[T]he thrust of the [Seventh] Amendment was to preserve the right to jury trial as it existed in 1791." *Curtis* v. *Loether,* 415 U. S. 189, 193. At common law, a litigant was not entitled to have a jury determine issues that had been previously adjudicated by a chancellor in equity. *Hopkins* v. *Lee,* 6 Wheat. 109; *Smith* v. *Kernochen,* 7 How. 198, 217–218; *Brady* v. *Daly,* 175 U. S. 148, 158–159; Shapiro & Coquillette, The Fetish of Jury Trial in Civil Cases: A Comment on Rachal *v.* Hill, 85 Harv. L. Rev. 442, 448–458 (1971).[21]

Recognition that an equitable determination could have collateral-estoppel effect in a subsequent legal action was the major premise of this Court's decision in *Beacon Theatres, Inc.* v. *Westover,* 359 U. S. 500. In that case the plaintiff sought a declaratory judgment that certain arrangements between it

---

[20] The Seventh Amendment provides: "In Suits at common law, where the value in controversy shall exceed twenty dollars, the right to jury trial shall be preserved. . . ."

[21] The authors of this article conclude that the historical sources "indicates that in the late eighteenth and early nineteenth centuries, determinations in equity were thought to have as much force as determinations at law, and that the possible impact on jury trial rights was not viewed with concern. . . . If collateral estoppel is otherwise warranted, the jury trial question should not stand in the way." 85 Harv. L. Rev., at 455–456. This common-law rule is adopted in the Restatement of Judgments § 68, Comment *j* (1942).

and the defendant were not in violation of the antitrust laws, and asked for an injunction to prevent the defendant from instituting an antitrust action to challenge the arrangements. The defendant denied the allegations and counterclaimed for treble damages under the antitrust laws, requesting a trial by jury of the issues common to both the legal and equitable claims. The Court of Appeals upheld denial of the request, but this Court reversed, stating:

> "[T]he effect of the action of the District Court could be, as the Court of Appeals believed, 'to limit the petitioner's opportunity fully to try to a jury every issue which has a bearing upon its treble damage suit,' for determination of the issue of clearances by the judge might 'operate either by way of res judicata or collateral estoppel so as to conclude both parties with respect thereto at the subsequent trial of the treble damage claim.'" *Id.*, at 504.

It is thus clear that the Court in the *Beacon Theatres* case thought that if an issue common to both legal and equitable claims was first determined by a judge, relitigation of the issue before a jury might be foreclosed by res judicata or collateral estoppel. To avoid this result, the Court held that when legal and equitable claims are joined in the same action, the trial judge has only limited discretion in determining the sequence of trial and "that discretion . . . must, wherever possible, be exercised to preserve jury trial." *Id.*, at 510.[22]

Both the premise of *Beacon Theatres,* and the fact that it enunciated no more than a general prudential rule were confirmed by this Court's decision in *Katchen* v. *Landy,* 382 U. S. 323. In that case the Court held that a bankruptcy court, sitting as a statutory court of equity, is empowered to adjudi-

---

[22] Similarly, in both *Dairy Queen, Inc.* v. *Wood,* 369 U. S. 469, and *Meeker* v. *Ambassador Oil Corp.,* 375 U. S. 160, the Court held that legal claims should ordinarily be tried before equitable claims to preserve the right to a jury trial.

cate equitable claims prior to legal claims, even though the factual issues decided in the equity action would have been triable by a jury under the Seventh Amendment if the legal claims had been adjudicated first.   The Court stated:

> "Both *Beacon Theatres* and *Dairy Queen* recognize that there might be situations in which the Court could proceed to resolve the equitable claim first even though the results might be dispositive of the issues involved in the legal claim."   *Id.*, at 339.

Thus the Court in *Katchen* v. *Landy* recognized that an equitable determination can have collateral-estoppel effect in a subsequent legal action and that this estoppel does not violate the Seventh Amendment.

## B

Despite the strong support to be found both in history and in the recent decisional law of this Court for the proposition that an equitable determination can have collateral-estoppel effect in a subsequent legal action, the petitioners argue that application of collateral estoppel in this case would nevertheless violate their Seventh Amendment right to a jury trial. The petitioners contend that since the scope of the Amendment must be determined by reference to the common law as it existed in 1791, and since the common law permitted collateral estoppel only where there was mutuality of parties, collateral estoppel cannot constitutionally be applied when such mutuality is absent.

The petitioners have advanced no persuasive reason, however, why the meaning of the Seventh Amendment should depend on whether or not mutuality of parties is present.   A litigant who has lost because of adverse factual findings in an equity action is equally deprived of a jury trial whether he is estopped from relitigating the factual issues against the same party or a new party.   In either case, the party against whom estoppel is asserted has litigated questions of fact, and has had the facts determined against him in an earlier proceeding.

In either case there is no further factfinding function for the jury to perform, since the common factual issues have been resolved in the previous action. Cf. *Ex parte Peterson*, 253 U. S. 300, 310 ("No one is entitled in a civil case to trial by jury unless and except so far as there are issues of fact to be determined").

The Seventh Amendment has never been interpreted in the rigid manner advocated by the petitioners. On the contrary, many procedural devices developed since 1791 that have diminished the civil jury's historic domain have been found not to be inconsistent with the Seventh Amendment. See *Galloway* v. *United States*, 319 U. S. 372, 388–393 (directed verdict does not violate the Seventh Amendment); *Gasoline Products Co.* v. *Champlin Refining Co.*, 283 U. S. 494, 497–498 (retrial limited to question of damages does not violate the Seventh Amendment even though there was no practice at common law for setting aside a verdict in part); *Fidelity & Deposit Co.* v. *United States*, 187 U. S. 315, 319–321 (summary judgment does not violate the Seventh Amendment).[23]

The *Galloway* case is particularly instructive. There the party against whom a directed verdict had been entered argued that the procedure was unconstitutional under the Seventh Amendment. In rejecting this claim, the Court said:

"The Amendment did not bind the federal courts to the exact procedural incidents or details of jury trial accord-

---

[23] The petitioners' reliance on *Dimick* v. *Schiedt*, 293 U. S. 474, is misplaced. In the *Dimick* case the Court held that an increase by the trial judge of the amount of money damages awarded by the jury violated the *second* clause of the Seventh Amendment, which provides that "no fact tried by a jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law." Collateral estoppel does not involve the "re-examination" of any fact decided by a jury. On the contrary, the whole premise of collateral estoppel is that once an issue has been resolved in a prior proceeding, there is no further factfinding function to be performed.

ing to the common law in 1791, any more than it tied them to the common-law system of pleading or the specific rules of evidence then prevailing. Nor were 'the rules of the common law' then prevalent, including those relating to the procedure by which the judge regulated the jury's role on questions of fact, crystallized in a fixed and immutable system. . . .

"The more logical conclusion, we think, and the one which both history and the previous decisions here support, is that the Amendment was designed to preserve the basic institution of jury trial in only its most fundamental elements, not the great mass of procedural forms and details, varying even then so widely among common-law jurisdictions." 319 U. S., at 390, 392 (footnote omitted).

The law of collateral estoppel, like the law in other procedural areas defining the scope of the jury's function, has evolved since 1791. Under the rationale of the *Galloway* case, these developments are not repugnant to the Seventh Amendment simply for the reason that they did not exist in 1791. Thus if, as we have held, the law of collateral estoppel forecloses the petitioners from relitigating the factual issues determined against them in the SEC action, nothing in the Seventh Amendment dictates a different result, even though because of lack of mutuality there would have been no collateral estoppel in 1791.[24]

The judgment of the Court of Appeals is

*Affirmed.*

MR. JUSTICE REHNQUIST, dissenting.

It is admittedly difficult to be outraged about the treatment accorded by the federal judiciary to petitioners' demand for a jury trial in this lawsuit. Outrage is an emotion all but

---

[24] In reaching this conclusion, the Court of Appeals went on to state: "Were there any doubt about the [question whether the petitioners were entitled to a jury redetermination of the issues otherwise subject to col-

impossible to generate with respect to a corporate defendant in a securities fraud action, and this case is no exception. But the nagging sense of unfairness as to the way petitioners have been treated, engendered by the *imprimatur* placed by the Court of Appeals on respondent's "heads I win, tails you lose" theory of this litigation, is not dispelled by this Court's antiseptic analysis of the issues in the case. It may be that if this Nation were to adopt a new Constitution today, the Seventh Amendment guaranteeing the right of jury trial in civil cases in federal courts would not be included among its provisions. But any present sentiment to that effect cannot obscure or dilute our obligation to enforce the Seventh Amendment, which *was* included in the Bill of Rights in 1791 and which has not since been repealed in the only manner provided by the Constitution for repeal of its provisions.

The right of trial by jury in civil cases at common law is fundamental to our history and jurisprudence. Today, however, the Court reduces this valued right, which Blackstone praised as "the glory of the English law," to a mere "neutral"

---

lateral estoppel] it should in any event be resolved against the defendants in this case for the reason that, although they were fully aware of the pendency of the present suit throughout the non-jury trial of the SEC case, they made no effort to protect their right to a jury trial of the damage claims asserted by plaintiffs, either by seeking to expedite trial of the present action or by requesting Judge Duffy, in the exercise of his discretion pursuant to Rule 39 (b), (c), F.R.Civ.P., to order that the issues in the SEC case be tried by a jury or before an advisory jury." 565 F. 2d, at 821–822. (Footnote omitted.)

The Court of Appeals was mistaken in these suggestions. The petitioners did not have a right to a jury trial in the equitable injunctive action brought by the SEC. Moreover, an advisory jury, which might have only delayed and complicated that proceeding, would not in any event have been a Seventh Amendment jury. And the petitioners were not in a position to expedite the private action and stay the SEC action. The Securities Exchange Act of 1934 provides for prompt enforcement actions by the SEC unhindered by parallel private actions. 15 U. S. C. § 78u (g).

factor and in the name of procedural reform denies the right of jury trial to defendants in a vast number of cases in which defendants, heretofore, have enjoyed jury trials. Over 35 years ago, Mr. Justice Black lamented the "gradual process of judicial erosion which in one-hundred-fifty years has slowly worn away a major portion of the essential guarantee of the Seventh Amendment." *Galloway* v. *United States,* 319 U. S. 372, 397 (1943) (dissenting opinion). Regrettably, the erosive process continues apace with today's decision.[1]

I

The Seventh Amendment provides:

"In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise reexamined in any Court of the United States, than according to the rules of the common law."

The history of the Seventh Amendment has been amply documented by this Court and by legal scholars,[2] and it would serve no useful purpose to attempt here to repeat all that has been written on the subject. Nonetheless, the decision of this case turns on the scope and effect of the Seventh Amendment, which, perhaps more than with any other provision of the Constitution, are determined by reference to the historical

---

[1] Because I believe that the use of offensive collateral estoppel in this particular case was improper, it is not necessary for me to decide whether I would approve its use in circumstances where the defendant's right to a jury trial was not impaired.

[2] See, *e. g., Colgrove* v. *Battin,* 413 U. S. 149 (1973); *Capital Traction Co.* v. *Hof,* 174 U. S. 1 (1899); *Parsons* v. *Bedford,* 3 Pet. 433 (1830); Henderson, The Background of the Seventh Amendment, 80 Harv. L. Rev. 289 (1966) (hereinafter Henderson); Wolfram, The Constitutional History of the Seventh Amendment, 57 Minn. L. Rev. 639 (1973) (hereinafter Wolfram). See also *United States* v. *Wonson,* 28 F. Cas. 745 (No. 16,750) (CC Mass. 1812) (Story, C. J.).

setting in which the Amendment was adopted. See *Colgrove v. Battin*, 413 U. S. 149, 152 (1973). It therefore is appropriate to pause to review, albeit briefly, the circumstances preceding and attending the adoption of the Seventh Amendment as a guide in ascertaining its application to the case at hand.

## A

It is perhaps easy to forget, now more than 200 years removed from the events, that the right of trial by jury was held in such esteem by the colonists that its deprivation at the hands of the English was one of the important grievances leading to the break with England. See Sources and Documents Illustrating the American Revolution 1764–1788 and the Formation of the Federal Constitution 94 (S. Morison 2d ed. 1929); R. Pound, The Development of Constitutional Guarantees of Liberty 69–72 (1957); C. Ubbelohde, The Vice-Admiralty Courts and the American Revolution 208–211 (1960). The extensive use of vice-admiralty courts by colonial administrators to eliminate the colonists' right of jury trial was listed among the specific offensive English acts denounced in the Declaration of Independence.[3] And after

---

[3] The Declaration of Independence states: "For depriving us in many cases, of the benefits of Trial by Jury." Just two years earlier, in the Declaration of Rights adopted October 14, 1774, the first Continental Congress had unanimously resolved that "the respective colonies are entitled to the common law of England, and more especially to the great and inestimable privilege of being tried by their peers of the vicinage, according to the course of that law." 1 Journals of the Continental Congress 69 (1904).

Holdsworth has written that of all the new methods adopted to strengthen the administration of the British laws, "the most effective, and therefore the most disliked, was the extension given to the jurisdiction of the reorganized courts of admiralty and vice-admiralty. It was the most effective, because it deprived the defendant of the right to be tried by a jury which was almost certain to acquit him." 11 W. Holdsworth, A History of English Law 110 (1966). While the vice-admiralty courts dealt

war had broken out, all of the 13 newly formed States restored the institution of civil jury trial to its prior prominence; 10 expressly guaranteed the right in their state constitutions and the 3 others recognized it by statute or by common practice.[4] Indeed, "[t]he right to trial by jury was probably the only one universally secured by the first American state constitutions . . . ." L. Levy, Legacy of Suppression: Freedom of Speech and Press in Early American History 281 (1960).[5]

One might justly wonder then why no mention of the right of jury trial in civil cases should have found its way into the Constitution that emerged from the Philadelphia Convention in 1787. Article III, § 2, cl. 3, merely provides that "The Trial of all Crimes, except in Cases of Impeachment, shall be by Jury." The omission of a clause protective of the civil jury right was not for lack of trying, however. Messrs. Pinckney and Gerry proposed to provide a clause securing the right of jury trial in civil cases, but their efforts failed.[6] Several rea-

chiefly with criminal offenses, their jurisdiction also was extended to many areas of the civil law. Wolfram 654 n. 47.

[4] Ga. Const., Art. LXI (1777), in 2 The Federal and State Constitutions Colonial Charters, and Other Organic Laws 785 (F. Thorpe ed. 1909) (hereinafter Thorpe); Md. Const., Art. III (1776), in 3 Thorpe 1686–1687; Mass. Const., Art. XV (1780), in 3 Thorpe 1891–1892; N. H. Const., Art. XX (1784), in 4 Thorpe 2456; N. J. Const., Art. XXII (1776), in 5 Thorpe 2598; N. Y. Const., Art. XLI (1777), in 5 Thorpe 2637; N. C. Const., Declaration of Rights, Art. XIV (1776), in 5 Thorpe 2788; Pa. Const., Declaration of Rights, Art. XI (1776), in 5 Thorpe 3083; S. C. Const., Art. XLI (1778), in 6 Thorpe 3257; Va. Const., Bill of Rights, § 11 (1776), in 7 Thorpe 3814. See Wolfram 655.

[5] When Congress in 1787 adopted the Northwest Ordinance for governance of the territories west of the Appalachians, it included a guarantee of trial by jury in civil cases. 2 Thorpe 960–961.

[6] The proposal was to add the following language to Art. III: "And a trial by jury shall be preserved as usual in civil cases." 2 M. Farrand, The Records of the Federal Convention of 1787, p. 628 (1911). The

sons have been advanced for this failure. The Federalists argued that the practice of civil juries among the several States varied so much that it was too difficult to draft constitutional language to accommodate the different state practices. See *Colgrove* v. *Battin, supra,* at 153.[7] Whatever the reason for the omission, however, it is clear that even before the delegates had left Philadelphia, plans were under way to attack the proposed Constitution on the ground that it failed to contain a guarantee of civil jury trial in the new federal courts. See R. Rutland, George Mason 91 (1961); Wolfram 662.

The virtually complete absence of a bill of rights in the proposed Constitution was the principal focus of the Anti-Federalists' attack on the Constitution, and the lack of a provision for civil juries featured prominently in their arguments. See *Parsons* v. *Bedford,* 3 Pet. 433, 445 (1830). Their pleas struck a responsive chord in the populace, and the price exacted in many States for approval of the Constitution was the appending of a list of recommended amendments, chief among them a clause securing the right of jury trial in civil cases.[8] Responding to the pressures for a civil jury

---

debate regarding this proposal is quoted in *Colgrove* v. *Battin, supra,* at 153–155, n. 8.

[7] The objection of Mr. Gorham of Massachusetts was that "[t]he constitution of Juries is different in different States and the trial itself is *usual* in different cases in different States." 2 M. Farrand, *supra,* at 628. Commentators have suggested several additional reasons for the failure of the convention to include a civil jury guarantee. See Henderson 294–295; ("[T]he true reason for omitting a similar provision for civil juries was at least in part that the convention members simply wanted to go home"); Wolfram 660–666.

[8] See Henderson 298; Wolfram 667–703. Virginia's recommended jury trial amendment is typical: "That, in controversies respecting property, and in suits between man and man, the ancient trial by jury is one of the greatest securities to the rights of the people, and [ought] to remain sacred

guarantee generated during the ratification debates, the first Congress under the new Constitution at its first session in 1789 proposed to amend the Constitution by adding the following language: "In suits at common law, between man and man, the trial by jury, as one of the best securities to the rights of the people, ought to remain inviolate." 1 Annals of Cong. 435 (1789). That provision, altered in language to what became the Seventh Amendment, was proposed by the Congress in 1789 to the legislatures of the several States and became effective with its ratification by Virginia on December 15, 1791.[9]

The foregoing sketch is meant to suggest what many of those who oppose the use of juries in civil trials seem to ignore. The founders of our Nation considered the right of trial by jury in civil cases an important bulwark against tyranny and corruption, a safeguard too precious to be left to the whim of the sovereign, or, it might be added, to that of the judiciary.[10] Those who passionately advocated the right to a civil jury trial did not do so because they considered the jury a familiar procedural device that should be continued; the concerns for the institution of jury trial that led to the passages of the Declaration of Independence and to the Seventh Amendment were not animated by a belief that use of juries would lead to more efficient judicial administration. Trial by a jury of laymen rather than by the sovereign's judges

and inviolable." 3 J. Elliot, Debates on the Federal Constitution 658 (2d ed. 1836).

[9] The Judiciary Act of September 24, 1789, which was passed within six months of the organization of the new government and on the day before the first 10 Amendments were proposed to the legislatures of the States by the First Congress, provided for a civil jury trial right. 1 Stat. 77.

[10] Thomas Jefferson stated: "I consider [trial by jury] as the only anchor yet imagined by man, by which a government can be held to the principles of its constitution." 3 The Writings of Thomas Jefferson 71 (Washington ed. 1861).

was important to the founders because juries represent the layman's common sense, the "passional elements in our nature," and thus keep the administration of law in accord with the wishes and feelings of the community. O. Holmes, Collected Legal Papers 237 (1920). Those who favored juries believed that a jury would reach a result that a judge either could not or would not reach.[11] It is with these values that underlie the Seventh Amendment in mind that the Court should, but obviously does not, approach the decision of this case.

## B

The Seventh Amendment requires that the right of trial by jury be "preserved." Because the Seventh Amendment demands preservation of the jury trial right, our cases have uniformly held that the content of the right must be judged by historical standards. *E. g., Curtis* v. *Loether,* 415 U. S. 189, 193 (1974); *Colgrove* v. *Battin,* 413 U. S., at 155–156; *Ross* v. *Bernhard,* 396 U. S. 531, 533 (1970); *Capital Traction Co.* v. *Hof,* 174 U. S. 1, 8–9 (1899); *Parsons* v. *Bedford, supra,* at 446. Thus, in *Baltimore & Carolina Line* v. *Redman,* 295 U. S. 654, 657 (1935), the Court stated that "[t]he right of trial by jury thus preserved is the right which existed under the English common law when the Amendment was adopted."

---

[11] Wolfram 671. Professor Wolfram has written:

"[T]he antifederalists were not arguing for the institution of civil jury trial in the belief that jury trials were short, inexpensive, decorous and productive of the same decisions that judges sitting without juries would produce. The inconveniences of jury trial were accepted precisely because in important instances, through its ability to disregard substantive rules of law, the jury would reach a result that the judge either could not or would not reach. Those who favored the civil jury were not misguided tinkerers with procedural devices; they were, for the day, libertarians who avowed that important areas of protection for litigants in general, and for debtors in particular, would be placed in grave danger unless it were required that juries sit in civil cases." *Id.,* at 671–672.

And in *Dimick* v. *Schiedt,* 293 U. S. 474, 476 (1935), the Court held: "In order to ascertain the scope and meaning of the Seventh Amendment, resort must be had to the appropriate rules of the common law established at the time of the adoption of that constitutional provision in 1791." [12] If a jury would have been impaneled in a particular kind of case in 1791, then the Seventh Amendment requires a jury trial today, if either party so desires.

To be sure, it is the substance of the right of jury trial that is preserved, not the incidental or collateral effects of common-law practice in 1791. *Walker* v. *New Mexico & S. P. R. Co.,* 165 U. S. 593, 596 (1897). "The aim of the Amendment, as this Court has held, is to preserve the substance of the common-law right of trial by jury, as distinguished from mere matters of form or procedure, and particularly to retain the common-law distinction between the province of the court and that of the jury. . . ." *Baltimore & Carolina Line* v. *Redman, supra,* at 657. Accord, *Colgrove* v. *Battin, supra,* at 156–157; *Gasoline Products Co.* v. *Champlin Refining Co.,* 283 U. S. 494, 498 (1931); *Ex parte Peterson,* 253 U S. 300, 309 (1920). "The Amendment did not bind the federal courts to the exact procedural incidents or details of jury trial according to the common law of 1791, any more than it tied them to the common-law system of pleading or the specific rules of evidence then prevailing." *Galloway* v. *United States,* 319 U. S., at 390.

To say that the Seventh Amendment does not tie federal courts to the exact procedure of the common law in 1791 does

---

[12] The majority suggests that *Dimick* v. *Schiedt* is not relevant to the decision in this case because it dealt with the second clause of the Seventh Amendment. *Ante,* at 336 n. 23. I disagree. There is no intimation in that opinion that the first clause should be treated any differently from the second. The *Dimick* Court's respect for the guarantes of the Seventh Amendment applies as much to the first clause as to the second.

not imply, however, that any nominally "procedural" change can be implemented, regardless of its impact on the functions of the jury. For to sanction creation of procedural devices which limit the province of the jury to a greater degree than permitted at common law in 1791 is in direct contravention of the Seventh Amendment. See *Neely* v. *Martin K. Eby Constr. Co.,* 386 U. S. 317, 322 (1967); *Galloway* v. *United States, supra,* at 395; *Dimick* v. *Schiedt, supra,* at 487; *Ex parte Peterson, supra,* at 309–310. And since we deal here not with the common law *qua* common law but with the Constitution, no amount of argument that the device provides for more efficiency or more accuracy or is fairer will save it if the degree of invasion of the jury's province is greater than allowed in 1791. To rule otherwise would effectively permit judicial repeal of the Seventh Amendment because nearly any change in the province of the jury, no matter how drastic the diminution of its functions, can always be denominated "procedural reform."

The guarantees of the Seventh Amendment will prove burdensome in some instances; the civil jury surely was a burden to the English governors who, in its stead, substituted the vice-admiralty court. But, as with other provisions of the Bill of Rights, the onerous nature of the protection is no license for contracting the rights secured by the Amendment. Because " '[m]aintenance of the jury as a fact-finding body is of such importance and occupies so firm a place in our history and jurisprudence . . . any seeming curtailment of the right to a jury trial should be scrutinized with the utmost care.' " *Dimick* v. *Schiedt, supra,* at 486, quoted in *Beacon Theatres, Inc.* v. *Westover,* 359 U. S. 500, 501 (1959).

## C

Judged by the foregoing principles, I think it is clear that petitioners were denied their Seventh Amendment right to a

jury trial in this case. Neither respondent nor the Court doubts that at common law as it existed in 1791, petitioners would have been entitled in the private action to have a jury determine whether the proxy statement was false and misleading in the respects alleged. The reason is that at common law in 1791, collateral estoppel was permitted only where the parties in the first action were identical to, or in privity with, the parties to the subsequent action.[13]  It was not until 1971 that the doctrine of mutuality was abrogated by this Court in certain limited circumstances. *Blonder-Tongue Laboratories, Inc.* v. *University of Illinois Foundation,* 402 U. S. 313.[14]  But developments in the judge-made doctrine of collateral estoppel, however salutary, cannot, consistent with the Seventh Amendment, contract in any material fashion the right to a jury trial that a defendant would have enjoyed in 1791.  In the instant case, resort to the doctrine of collateral estoppel does more than merely contract the right to a jury trial: It eliminates the right entirely and therefore contravenes the Seventh Amendment.

The Court responds, however, that at common law "a litigant was not entitled to have a jury [in a subsequent action at law between the same parties] determine issues that had been previously adjudicated by a chancellor in equity," and that "petitioners have advanced no persuasive reason . . . why the meaning of the Seventh Amendment should depend on

---

[13] See *Smith* v. *Kernochen,* 7 How. 198, 218 (1849); *Hopkins* v. *Lee,* 6 Wheat. 109, 113–114 (1821); F. Buller, An Introduction to the Law Relative to Trials at Nisi Prius *232 (7th ed. 1817); T. Peake, A Compendium of the Law of Evidence 38 (2d ed. 1806).

[14] The Court's decision in *Blonder-Tongue Laboratories, Inc.* v. *University of Illinois Foundation* is, on its facts, limited to the defensive use of collateral estoppel in patent cases.  Abandonment of mutuality is a recent development.  The case of *Bernhard* v. *Bank of America Nat. Trust & Sav. Assn.,* 19 Cal. 2d 807, 122 P. 2d 892, generally considered the seminal case adopting the new approach, was not decided until 1942.

348

whether or not mutuality of parties is present." *Ante,* at 333, 335. But that is tantamount to saying that since a party would not be entitled to a jury trial if he brought an equitable action, there is no persuasive reason why he should receive a jury trial on virtually the same issues if instead he chooses to bring his lawsuit in the nature of a legal action. The persuasive reason is that the Seventh Amendment requires that a party's right to jury trial which existed at common law be "preserved" from incursions by the government or the judiciary. Whether this Court believes that use of a jury trial in a particular instance is necessary, or fair or repetitive is simply irrelevant. If that view is "rigid," it is the Constitution which commands that rigidity. To hold otherwise is to rewrite the Seventh Amendment so that a party is guaranteed a jury trial in civil cases unless this Court thinks that a jury trial would be inappropriate.

No doubt parallel "procedural reforms" could be instituted in the area of criminal jurisprudence, which would accomplish much the same sort of expedition of court calendars and conservation of judicial resources as would the extension of collateral estoppel in civil litigation. Government motions for summary judgment, or for a directed verdict in favor of the prosecution at the close of the evidence, would presumably save countless hours of judges' and jurors' time. It can scarcely be doubted, though, that such "procedural reforms" would not survive constitutional scrutiny under the jury trial guarantee of the Sixth Amendment. Just as the principle of separation of powers was not incorporated by the Framers into the Constitution in order to promote efficiency or dispatch in the business of government, the right to a jury trial was not guaranteed in order to facilitate prompt and accurate decision of lawsuits. The essence of that right lies in its insistence that a body of laymen not permanently attached to the sovereign participate along with the judge in the fact-

finding necessitated by a lawsuit. And that essence is as much a part of the Seventh Amendment's guarantee in civil cases as it is of the Sixth Amendment's guarantee in criminal prosecutions. Cf. *Thiel* v. *Southern Pacific Co.*, 328 U. S. 217, 220 (1946).

Relying on *Galloway* v. *United States, Gasoline Products Co.* v. *Champlin Refining Co.*, and *Fidelity & Deposit Co.* v. *United States*, 187 U. S. 315 (1902), the Court seems to suggest that the offensive use of collateral estoppel in this case is permissible under the limited principle set forth above that a mere procedural change that does not invade the province of the jury and a defendant's right thereto to a greater extent than authorized by the common law is permissible. But the Court's actions today constitute a far greater infringement of the defendant's rights than it ever before has sanctioned. In *Galloway*, the Court upheld the modern form of directed verdict against a Seventh Amendment challenge, but it is clear that a similar form of directed verdict existed at common law in 1791. *E. g., Beauchamp* v. *Borret,* Peake 148, 170 Eng. Rep. 110 (N. P. 1792); *Coupey* v. *Henley,* 2 Esp. 540, 542, 170 Eng. Rep. 448, 449 (C. P. 1797).[15] The modern form did not materially alter the function of the jury. Similarly, the modern device of summary judgment was found not to violate the Seventh Amendment because in 1791 a demurrer to the evidence, a procedural device substantially similar to summary judgment, was a common practice. *E. g., Pawling* v. *United States*, 4 Cranch 219, 221–222 (1808).[16]

---

[15] See Henderson 302–303 ("In the England of 1790 the phrase 'to direct a verdict' was common. Further, it was commonplace to instruct the jury 'that the plaintiff was entitled to recover,' or 'the plaintiff must have a verdict' "); Scott, Trial by Jury and the Reform of Civil Procedure, 31 Harv. L. Rev. 669, 686 (1918) (cases cited therein).

[16] To demur, a party would admit the truth of all the facts adduced against him and every adverse inference that could be drawn therefrom, and the court would determine which party should receive judgment on

The procedural devices of summary judgment and directed verdict are direct descendants of their common-law antecedents. They accomplish nothing more than could have been done at common law, albeit by a more cumbersome procedure. See also *Montgomery Ward & Co.* v. *Duncan,* 311 U. S. 243, 250 (1940). And while at common law there apparently was no practice of setting aside a verdict in part,[17] the Court in *Gasoline Products* permitted a partial retrial of "distinct and separable" issues because the change in procedure would not impair the substance of the right to jury trial. 283 U. S., at 498. The parties in *Gasoline Products* still enjoyed the right to have a jury determine all issues of fact.

By contrast, the development of nonmutual estoppel is a substantial departure from the common law and its use in this case completely deprives petitioners of their right to have a jury determine contested issues of fact. I am simply unwilling to accept the Court's presumption that the complete extinguishment of petitioners' right to trial by jury can be justified as a mere change in "procedural incident or detail." Over 40 years ago, Mr. Justice Sutherland observed in a not dissimilar case: "[T]his court in a very special sense is charged with the duty of construing and upholding the Constitution; and in the discharge of that important duty, it ever must be alert to see that a doubtful precedent be not extended by mere analogy to a different case if the result will be to weaken or subvert what it conceives to be a principle of the fundamental law of the land." *Dimick* v. *Schiedt,* 293 U. S., at 485.

---

the basis of these admitted facts and inferences. See *Slocum* v. *New York Life Ins. Co.,* 228 U. S. 364, 388 (1913); *Gibson* v. *Hunter,* 2 H. Bl. 187, 126 Eng. Rep. 499 (N. P. 1793); Henderson 304–305; Scott, *supra* n. 15, at 683–684.

[17] The Court in *Gasoline Products* quoted Lord Mansfield, who stated that when a verdict is correct as to one issue but erroneous as to another " 'for form's sake, we must set aside the whole verdict . . . .' " *Edie* v. *East India Co.,* 1 W. Bl. 295, 298 (K. B. 1761), quoted 283 U. S., at 498.

## II

Even accepting, *arguendo*, the majority's position that there is no violation of the Seventh Amendment here, I nonetheless would not sanction the use of collateral estoppel in this case. The Court today holds:

> "The general rule should be that in cases where a plaintiff could easily have joined in the earlier action or where, either for the reasons discussed above or for other reasons, the application of offensive estoppel would be unfair to a defendant, a trial judge should not allow the use of offensive collateral estoppel." *Ante*, at 331.

In my view, it is "unfair" to apply offensive collateral estoppel where the party who is sought to be estopped has not had an opportunity to have the facts of his case determined by a jury. Since in this case petitioners were not entitled to a jury trial in the Securities and Exchange Commission (SEC) lawsuit,[18] I would not estop them from relitigating the issues determined in the SEC suit before a jury in the private action. I believe that several factors militate in favor of this result.

First, the use of offensive collateral estoppel in this case runs counter to the strong federal policy favoring jury trials, even if it does not, as the majority holds, violate the Seventh Amendment. The Court's decision in *Beacon Theatres, Inc.* v. *Westover,* 359 U. S. 500 (1959), exemplifies that policy. In *Beacon Theatres* the Court held that where both equitable and legal claims or defenses are presented in a single case, "only under the most imperative circumstances, circumstances which in view of the flexible procedures of the Federal Rules we cannot now anticipate, can the right to a jury trial of legal issues be lost through prior determination of equitable claims."

---

[18] I agree with the Court that "petitioners did not have a right to a jury trial in the equitable injunctive action brought by the SEC." *Ante,* at 338 n. 24.

*Id.*, at 510–511.[19]   And in *Jacob* v. *New York*, 315 U. S. 752, 752–753 (1942), the Court stated: "The right of jury trial in civil cases at common law is a basic and fundamental feature of our system of federal jurisprudence which is protected by the Seventh Amendment.  A right so fundamental and sacred to the citizen, whether guaranteed by the Constitution or provided by statute, should be jealously guarded by the courts." Accord, *Simler* v. *Conner*, 372 U. S. 221, 222 (1963); *Byrd* v. *Blue Ridge Rural Electric Cooperative, Inc.*, 356 U. S. 525, 537–539 (1958) (strong federal policy in favor of juries requires jury trials in diversity cases, regardless of state practice).  Today's decision will mean that in a large number of private cases defendants will no longer enjoy the right to jury trial.[20]   Neither the Court nor respondent has adverted or cited to any unmanageable problems that have resulted

---

[19] *Meeker* v. *Ambassador Oil Corp.*, 375 U. S. 160 (1963) (*per curiam*), is a case where the doctrine of collateral estoppel yielded to the right to a jury trial.  In *Meeker*, plaintiffs asserted both equitable and legal claims, which presented common issues, and demanded a jury trial.  The trial court tried the equitable claim first, and decided that claim, and the common issues, adversely to plaintiffs.  As a result, it held that plaintiffs were precluded from relitigating those same issues before a jury on their legal claim.  308 F. 2d 875, 884 (CA10 1962).  Plaintiffs appealed, alleging a denial of their right to a jury trial, but the Tenth Circuit affirmed the trial court.  This Court reversed the Court of Appeals on the basis of *Beacon Theatres, Inc.* v. *Westover*, 359 U. S. 500 (1959), and *Dairy Queen, Inc.* v. *Wood*, 369 U. S. 469 (1962), even though, unlike those cases, the equitable action in *Meeker* already had been tried and the common issues determined by the court.  Thus, even though the plaintiffs in *Meeker* had received a "full and fair" opportunity to try the common issues in the prior equitable action, they nonetheless were given the opportunity to retry those issues before a jury.  Today's decision is totally inconsistent with *Meeker* and the Court fails to explain this inconsistency.

[20] The Court's decision today may well extend to other areas, such as antitrust, labor, employment discrimination, consumer protection, and the like, where a private plaintiff may sue for damages based on the same or similar violations that are the subject of government actions.

from according defendants jury trials in such cases. I simply see no "imperative circumstances" requiring this wholesale abrogation of jury trials.[21]

Second, I believe that the opportunity for a jury trial in the second action could easily lead to a different result from that obtained in the first action before the court and therefore that it is unfair to estop petitioners from relitigating the issues before a jury. This is the position adopted in the Restatement (Second) of Judgments, which disapproves of the application of offensive collateral estoppel where the defendant has an opportunity for a jury trial in the second lawsuit that was not available in the first action.[22] The Court accepts the proposition that it is unfair to apply offensive collateral estoppel "where the second action affords the defendant procedural opportunities unavailable in the first action that could readily cause a different result." *Ante,* at 331. Differences in discovery opportunities between the two actions are cited as examples of situations where it would be unfair to permit offensive collateral estoppel. *Ante,* at 331 n. 15. But in the Court's view, the fact that petitioners would have been entitled to a jury trial in the present action is not such a "procedural opportunit[y]" because "the presence or absence of a jury as factfinder is basically *neutral,* quite unlike, for example, the

---

[21] This is not to say that Congress cannot commit enforcement of statutorily created rights to an "administrative process or specialized court of equity." *Curtis* v. *Loether,* 415 U. S. 189, 195 (1974); see *Atlas Roofing Co., Inc.* v. *Occupational Safety & Health Review Comm'n,* 430 U. S. 442 (1977); *Katchen* v. *Landy,* 382 U. S. 323 (1966); *NLRB* v. *Jones & Laughlin Steel Corp.,* 301 U. S. 1 (1937).

[22] Restatement (Second) of Judgments § 88 (2), Comment *d* (Tent. Draft No. 2, Apr. 15, 1975). Citing *Rachal* v. *Hill,* 435 F. 2d 59 (CA5 1970), cert. denied, 403 U. S. 904 (1971), the Reporter's Note states: "The differences between the procedures available in the first and second actions, while not sufficient to deny issue preclusion between the same parties, may warrant a refusal to carry over preclusion to an action involving another party." Restatement, *supra,* at 100.

354

necessity of defending the first lawsuit in an inconvenient forum." *Ante*, at 332 n. 19 (emphasis added).

As is evident from the prior brief discussion of the development of the civil jury trial guarantee in this country, those who drafted the Declaration of Independence and debated so passionately the proposed Constitution during the ratification period, would indeed be astounded to learn that the presence or absence of a jury is merely "neutral," whereas the availability of discovery, a device unmentioned in the Constitution, may be controlling. It is precisely because the Framers believed that they might receive a different result at the hands of a jury of their peers than at the mercy of the sovereign's judges, that the Seventh Amendment was adopted. And I suspect that anyone who litigates cases before juries in the 1970's would be equally amazed to hear of the supposed lack of distinction between trial by court and trial by jury. The Court can cite no authority in support of this curious proposition. The merits of civil juries have been long debated, but I suspect that juries have never been accused of being merely "neutral" factors.[23]

Contrary to the majority's supposition, juries can make a difference, and our cases have, before today at least, recognized this obvious fact. Thus, in *Colgrove* v. *Battin*, 413 U. S., at 157, we stated that "the purpose of the jury trial in . . . civil cases [is] to assure a fair and equitable resolution of factual issues, *Gasoline Products Co.* v. *Champlin Co.*, 283 U. S. 494, 498 (1931) . . . ." And in *Byrd* v. *Blue Ridge*

---

[23] See, *e. g.*, Hearings on Recording of Jury Deliberations before the Subcommittee to Investigate the Administration of the Internal Security Act and Other Internal Security Laws of the Senate Committee on the Judiciary, 84th Cong., 1st Sess., 63–81 (1955) (thorough summary of arguments pro and con on jury trials and an extensive bibliography); H. Kalven & H. Zeisel, The American Jury 4 n. 2 (1966) (bibliography); Redish, Seventh Amendment Right to Jury Trial: A Study in the Irrationality of Rational Decision Making, 70 Nw. U. L. Rev. 486, 502–508 (1975) (discussion of arguments for and against juries).

*Rural Electrical Cooperative, supra,* at 537, the Court conceded that "the nature of the tribunal which tries issues may be important in the enforcement of the parcel of rights making up a cause of action or defense . . . . It may well be that in the instant personal-injury case the outcome would be substantially affected by whether the issue of immunity is decided by a judge or a jury." See *Curtis* v. *Loether,* 415 U. S., at 198; cf. *Duncan* v. *Louisiana,* 391 U. S. 145, 156 (1968). Jurors bring to a case their common sense and community values; their "very inexperience is an asset because it secures a fresh perception of each trial, avoiding the stereotypes said to infect the judicial eye." H. Kalven & H. Zeisel, The American Jury 8 (1966).

The ultimate irony of today's decision is that its potential for significantly conserving the resources of either the litigants or the judiciary is doubtful at best. That being the case, I see absolutely no reason to frustrate so cavalierly the important federal policy favoring jury decisions of disputed fact questions. The instant case is an apt example of the minimal savings that will be accomplished by the Court's decision. As the Court admits, even if petitioners are collaterally estopped from relitigating whether the proxy was materially false and misleading, they are still entitled to have a jury determine whether respondent was injured by the alleged misstatements and the amount of damages, if any, sustained by respondent. *Ante,* at 325 n. 2. Thus, a jury must be impaneled in this case in any event. The time saved by not trying the issue of whether the proxy was materially false and misleading before the jury is likely to be insubstantial.[24] It is just as probable that today's decision will have the result of coercing defendants to agree to consent orders or settle-

---

[24] Much of the delay in jury trials is attributed to the jury selection, *voir dire,* and the charge. See H. Zeisel, H. Kalven, & B. Buchholz, Delay in the Court 79 (1959). None of these delaying factors will be avoided by today's decision.

ments in agency enforcement actions in order to preserve their right to jury trial in the private actions.  In that event, the Court, for no compelling reason, will have simply added a powerful club to the administrative agencies' arsenals that even Congress was unwilling to provide them.