**Jay C. SMITH, Plaintiff,**

v.

**John J. HOLTZ, et al., Defendants.**

No. 4:CV–93–1428.

United States District Court,
M.D. Pennsylvania.

Dec. 14, 1998.

---

Gerald J. Williams, Williams and Cuker, Philadelphia, PA, Leslie M. Fields, Costopoulos Foster & Fields, Lemoyne, PA, for plaintiff.

Gregory R. Neuhauser, Senior Deputy Attorney General, Commonwealth of Pennsylvania, Office of the Attorney General, Litigation Section, Harrisburg, PA, for defendants.

## MEMORANDUM

McCLURE, District Judge.

### BACKGROUND:

This unique case is before the court on post-trial motions following the return of a verdict in favor of two former troopers of the Pennsylvania State Police and an attorney for the Pennsylvania Office of the Attorney General. The issues presented involve primarily whether certain evidence was material and exculpatory within the meaning of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), whether this court erred with respect to certain evidentiary rulings and whether the jury verdict was unreasonable in light of the evidence presented.

On September 15, 1993, plaintiff Jay C. Smith commenced this action with the filing of a complaint pursuant to 42 U.S.C. § 1983. Smith alleged that he was tried and sentenced to death in violation of the Constitution of the United States due to prosecutorial and police misconduct. His conviction in 1986 was reversed on direct appeal due to the admission of hearsay. The Supreme Court of Pennsylvania eventually determined that the Double Jeopardy Clause of the Pennsylvania Constitution barred a re-trial. The latter ruling was based on police and prosecutorial misconduct relating to the suppression of evidence.

At the time of trial, defendants were John J. Holtz, Victor Dove, John J. Purcell, and Paul Yatron. Holtz and Dove were members of the Pennsylvania State Police involved in the murder investigation. Purcell was with the State Police office which investigated perjury charges against another Trooper. Yatron was a supervising attorney with the Office of the Attorney General. Two other defendants, Ronald Colyer and William Lander, were dismissed prior to trial, and the claims against Purcell were withdrawn during trial.

On September 4, 1998, a jury returned a verdict in favor of defendants on all claims and issues presented for consideration. Before the court is Smith's motion for judgment as a matter of law, also called a motion for judgment notwithstanding the verdict, or for a new trial.

### DISCUSSION:

#### I. STANDARD

The applicable rule provides:

If, for any reason, the court does not grant a motion for judgment as a matter of law made at the close of all the evidence, the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. The movant may renew its request for judgment as a matter of law by filing a motion no later than 10 days after entry of judgment—and may alternatively request a new trial or join a motion for a new trial under Rule 59. In ruling on a renewed motion, the court may:

(1) if a verdict was returned:

(A) allow the judgment to stand,

(B) order a new trial, or

(C) direct entry of judgment as a matter of law; . . .

Fed.R.Civ.P. 50(b)(1). Smith's motion is brought under both Rule 50 and Fed. R.Civ.P. 59.

Whether made under Rule 50(a) or 50(b), a motion for judgment as a matter of law should be granted only if, viewing the evidence in the light most favorable to the non-movant, and giving the non-movant the advantage of every reasonable and fair inference, there is insufficient evidence from which a jury reasonably could find against the movant. The movant is entitled to judgment if there is no question of material fact for the jury and any verdict other than the one directed would be erroneous under the governing law. *Beck v. City of Pittsburgh,* 89 F.3d 966, 970–971 (3d Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1086, 137 L.Ed.2d 219 (1997); *McDaniels v. Flick,* 59 F.3d 446, 453 (3d Cir.1995), *cert. denied,* 516 U.S. 1146, 116 S.Ct. 1017, 134 L.Ed.2d 97 (1996).

A motion for a new trial may be granted if the verdict is against the clear weight of the evidence and a miscarriage of justice would result if the verdict were allowed to stand. *Delli Santi v. CNA Insurance Cos.,* 88 F.3d 192, 201 (3d Cir.1996). A district court has more discretion to scrutinize a jury's verdict when a case is factually complex and potentially outside a layman's understanding. *Id.*

When Smith moved for judgment as a matter of law at the close of the evidence, the court denied the motion and indicated that it would consider a renewed motion under Fed. R.Civ.P. 50(b)(1). Since the verdict was for the defense, Smith properly has brought the instant motion under that provision.

## II. STATEMENT OF FACTS

There have been a number of opinions published related to this case, either the original criminal proceedings or the civil matters arising therefrom. *See, e.g., Commonwealth v. Smith,* 523 Pa. 577, 568 A.2d 600

(1989) (vacating Smith's conviction); *Commonwealth v. Smith,* 404 Pa.Super. 553, 591 A.2d 730 (1991) (re-trial not barred by Double Jeopardy Clause); *Commonwealth v. Smith,* 532 Pa. 177, 615 A.2d 321 (1992) (reversing previously cited opinion and holding that Double Jeopardy Clause barred re-trial due to prosecutorial misconduct); *Smith v. Wambaugh,* 22 Pa.D. & C.4th 219 (Pa. Com.Pl. Huntingdon 1993), *aff'd,* 440 Pa.Super. 640, 654 A.2d 606 (1994) (table), *allocatur denied,* 540 Pa. 641, 659 A.2d 560 (1995) (table); *Smith v. Holtz,* 856 F.Supp. 227 (M.D.Pa.1994), *reconsideration denied,* 879 F.Supp. 435 (M.D.Pa.1995), *aff'd,* 87 F.3d 108 (3d Cir.), *cert. denied sub nom. Wambaugh v. Smith,* —— U.S. ——, 117 S.Ct. 611, 136 L.Ed.2d 536 (1996); *Smith v. Wambaugh,* 887 F.Supp. 752 (M.D.Pa.1995), *aff'd sub nom. Smith v. Holtz,* 87 F.3d 108 (3d Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 611, 136 L.Ed.2d 536 (1996). A more detailed recitation of the facts of this case may be found in those opinions. Also, several books have been published on the case, including *Echoes in the Darkness* by Joseph Wambaugh and *Principal Suspect: The True Story of Dr. Jay Smith and the Main Line Murders* by William C. Costopoulos.[1] We limit our recitation of the facts to those necessary to dispose of the motion and to place the motion into context.

On Monday, June 25, 1979, the body of Susan Reinert, an English teacher at the Upper Merion High School, was discovered outside the Host Inn in Swatara Township, Dauphin County, Pennsylvania. The body showed evidence that Ms. Reinert had been chained and beaten, and her nude body was left lying in the fetal position in the back of her car, with the hatchback open. The cause of death was determined to be asphyxiation from an overdose of morphine. Susan Reinert was last seen alive the preceding Friday leaving her home with her children, Karen

---

1. Mr. Wambaugh was the defendant in a companion case to the instant case. The court recently granted summary judgment in his favor, finding no evidence to support a conspiracy between Mr. Wambaugh and any defendant in this case. *Smith v. Wambaugh,* No. 1:CV–94–1470,

1998 WL 864434, 29 F.Supp.2d 222 (M.D.Pa. filed December 8, 1998). Other opinions in that case are cited above. Mr. Costopoulos was Smith's defense attorney in the state criminal proceedings.

and Michael. The children were never seen again, and are presumed dead.[2]

The chief investigator in the case during its initial stages was Joseph Van Nort, a criminal investigator with the Pennsylvania State Police. The case received a great deal of publicity due to the lurid details which came to light. Those details need not be repeated here. Eventually, a fellow teacher in the English department at Upper Merion, William S. Bradfield, was arrested for the murder. Bradfield was the named beneficiary of Susan Reinert's will and life insurance policies. He was tried and convicted of the murders, and sentenced to life in prison. He died there earlier this year.

In 1986, Jay C. Smith, a former principal at Upper Merion, was arrested for the murders, tried, convicted, and sentenced to death. At the time of his arrest, Smith had been serving a sentence for robberies. In 1989, the conviction and sentence were overturned by the Supreme Court of Pennsylvania, which found error in the admission of statements by Bradfield which constituted hearsay. After further proceedings, the Supreme Court found that prosecutorial misconduct related to newly discovered evidence barred a second trial.

During the early stages of the criminal investigation, Susan Reinert's ex-husband sent newspaper clippings to defendant Joseph Wambaugh, an author who specializes in true crime books and fictional stories involving police. Wambaugh himself is a former policeman. Wambaugh became interested in the story and contacted Van Nort about the possibility of a book. He offered $50,000.00 to Van Nort for a personal depiction waiver, which would release Wambaugh from liability for the manner in which Van Nort was portrayed. Van Nort died before any payment was made or waiver executed.

Van Nort's partner, John (Jack) Holtz became the lead investigator and found a letter from Wambaugh to Van Nort which outlined

their agreement. Holtz later entered into an identical agreement with Wambaugh and received the $50,000.00. It is the agreement and related payment which Smith claims served as the motivation for the suppression of the evidence which is the subject of this action under § 1983.

The specific evidence at issue consists of two grains of quartz found on the feet of Susan Reinert during the autopsy. Before the coroner began his work on the body, a state trooper named John Balshy (now retired) did a preliminary examination of the body for physical evidence. He found, for instance, red fibers which were similar to fibers from a carpet, a piece of which was found in the basement of Smith's former residence. He also noticed what he termed a "sparkle" on the feet of Susan Reinert. He used rubber "lifters," so named because they usually are used to "lift" fingerprints from a crime scene, to collect material from the feet. The lifter consists of a flat piece of rubber with adhesive on one side. A clear piece of cellophane is removed to expose the adhesive surface. Balshy did so, folded the lifters so that only the adhesive surface was exposed, and placed the lifters between the toes of Susan Reinert's body. He also used the lifters, in the original flat form, to lift material from elsewhere on the feet.

At the time of the autopsy, Balshy thought that the material was dust or lint, and of little or no evidentiary value. He gave the lifters to Colyer, who was collecting evidence, and did not see them again until much later.

At Smith's criminal trial, part of the defense theory was that Susan Reinert was killed at the shore resort of Cape May, New Jersey. Bradfield and a number of rather gullible cohorts had gathered there on the weekend of the murder, with Bradfield specifically stating that he wanted an alibi in case Smith should try to kill Susan Reinert that weekend. The prosecution's theory was that Bradfield and Smith had conspired to

**2.** Recent news reports indicate that there may be a clue to the whereabouts of the bodies of Karen and Michael Reinert. A 1986 photograph has been found among William Bradfield's belongings which shows a stone marker in a wooded area. The Pennsylvania State Police are investi-

gating but are unsure of the significance of the marker. *Reinert evidence revealed,* The Harrisburg Patriot, November 18, 1998, at A1, 1998 WL 6486656. Neither the marker nor any other evidence of bodies has been located.

commit the murder, with Bradfield assisting with the original abduction of Susan, Karen, and Michael Reinert during a time not covered by his alibi. According to the prosecution, Smith then committed the murders (or at least Susan Reinert's) with the expectation that he would share in the proceeds of Susan Reinert's will and life insurance, of which Bradfield was the beneficiary.

The lifters themselves never appeared in evidence at Smith's trial, but Balshy testified that he had used the lifters. He stated that he did not know what the material was that had caught his attention, but that it "could have been sand." The relevance of finding sand on the feet of the victim is that it would support the defense theory of a murder at a seaside resort, i.e a place with a beach.

In reaction to Balshy's testimony, the prosecutor, Richard Guida of the Office of the Attorney General, exploded. He attacked Balshy's credibility despite the importance of the fibers found by Balshy at the same time that he found the material which could have been sand. It appears that Guida had never been told about the lifters, and did not find out about their discovery until after the trial had ended.

According to defendant Victor Dove, after the Commonwealth rested its case against Smith, he had the duty of gathering up the evidence which had been collected but not given to Guida for introduction into evidence. While doing so, he found the lifters. Dove did not contact anyone immediately about the find, but went to defendant Holtz on the night the trial ended to inform him of the discovery. Holtz contacted Guida, who in turn directed Holtz to bring the lifters to him (Guida) the next day. When Holtz did so, Guida concluded that the lifters were not material. They were turned over to the State Police Bureau of Professional Responsibility, which, at Guida's request, was conducting an investigation into possible perjury by Balshy. Once that investigation was concluded, the lifters remained in the investigative file until 1988.

While the case was still on direct appeal, counsel for Smith learned that the lifters existed, demanded disclosure, and finally received official notification on July 12, 1988.

A motion to dismiss the case related to the evidence was presented to the Supreme Court, but the motion was deferred for consideration on remand. On remand, the trial court found misconduct related to the suppression of the lifters and to the suppression of impeachment evidence. However, it found that retrial was not barred. The Superior Court affirmed, but the Supreme Court of Pennsylvania reversed and ordered Smith freed from custody.

This civil action followed.

### III. THE LIFTERS AS BRADY MATERIAL

When the Supreme Court of Pennsylvania ruled that there was misconduct by the police and prosecution sufficient to bar a retrial, it based its holding on two grounds, the suppression of the lifters and the failure to disclose impeachment material for a Commonwealth witness. The latter referred to potentially favorable treatment at a pending sentencing for the witness in return for his testimony. *See generally Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) (impeachment material falls within purview of *Brady* ). Since the complaint in the instant case was limited to the suppression of the lifters, the favorable treatment for the witness was not an issue in this case except as evidence of the prosecution's intent/malice in its treatment of Smith. We therefore will limit our discussion to the lifters as *Brady* material.

"[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady* at 87, 83 S.Ct. 1194. Evidence is favorable to the accused if it would tend to exculpate him or to reduce the penalty. *Brady* at 87–88, 83 S.Ct. 1194. Evidence is material if its suppression undermines confidence in the outcome of the trial. *United States v. Bagley,* 473 U.S. 667, 678, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985).

The arguments presented by Smith may be stated as follows:

(1) This court was bound by the holding of the Supreme Court of Pennsylvania that the lifters were material and exculpatory;

(2) The issue of whether the lifters were material and exculpatory is a question for the court and not a question for the jury, despite its nature as a mixed question of law and fact;

(3) Assuming the issue to be one for the court, the court was bound to find that the lifters were material and exculpatory evidence based on the overwhelming weight of the evidence;

(4) Assuming the issue to be one for the jury, the jury was bound to find that the lifters were material and exculpatory based on the overwhelming weight of the evidence;

(5) The error was not harmless.

We conclude that we were not bound by the holdings of the state courts, that the question was properly submitted to the jury, that the verdict was not against the weight of the evidence, and that, if the question is one for the court, we agree with the verdict of the jury. Based on the foregoing, we do not reach the question of harmless error.

We turn first to the question of whether we are bound by the holding of the state courts.

## (1) Preclusive Effect of State Court Proceedings

Smith contends that we are bound by the principle of collateral estoppel, also called issue preclusion, to adhere to the holding of the Supreme Court of Pennsylvania that the lifters are material and exculpatory. Specifically, he seeks to use "offensive collateral estoppel" to bar relitigation of the issue.

Neither the court nor the parties points to an opinion of the Third Circuit indicating that a federal district court, hearing a civil action under § 1983, is bound by the holding of a state court in underlying or related criminal proceedings. However, at least two courts of appeals and one district court have held that a federal district court is not bound, or at least not necessarily bound, to follow the state court's holding under such circumstances.

█ "Offensive collateral estoppel occurs whenever a plaintiff seeks to estop a defendant from relitigating an issue which the defendant previously litigated and lost against another plaintiff." *Raytech Corp. v. White*, 54 F.3d 187, 190 n. 5 (3d Cir.) (citing *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 329, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979)), *cert. denied*, 516 U.S. 914, 116 S.Ct. 302, 133 L.Ed.2d 207 (1995). The doctrine of collateral estoppel may be invoked when the following circumstances are present:

(1) The issue decided in the prior adjudication was identical with the one presented in the later action;

(2) There was a final judgment on the merits;

(3) The party against whom the plea is asserted was a party or in privity with a party to the prior adjudication; and

(4) The party against whom it is asserted has had a full and fair opportunity to litigate the issue in question in the prior action.

*Temple Univ. v. White*, 941 F.2d 201, 212 (3d Cir.1991), *cert. denied sub nom. Snider v. Temple Univ.*, 502 U.S. 1032, 112 S.Ct. 873, 116 L.Ed.2d 778 (1992).[3] Collateral estoppel is inappropriate when the facts essential to the earlier litigation have changed or if application of the doctrine would work unfairness to the party against whom it is asserted. *Raytech* at 190. That the party against whom collateral estoppel is asserted has had a full and fair opportunity to litigate the issue is a "central tenet of issue preclusion." *In re Braen*, 900 F.2d 621, 628 (3d Cir.1990), *cert. denied sub nom. Braen v. Laganella*, 498 U.S. 1066, 111 S.Ct. 782, 112 L.Ed.2d 845 (1991).

In *Duncan v. Clements*, 744 F.2d 48 (8th Cir.1984), the issue was whether there was probable cause to search and arrest the plaintiff. The plaintiff had moved to suppress evidence found in the search, and the motion was granted. The case was dismissed by the prosecution for lack of evidence, i.e. the same evidence which had been

---

**3.** These elements are stated in a different form in *Raytech* at 190.

suppressed. Applying the same factors recited above, *id.* at 51, the Eighth Circuit held that the police officer who conducted the search was not collaterally estopped from relitigating the issue of probable cause, reasoning:

> The State of Missouri, not [the defendant police officer], was a party to [the plaintiff]'s criminal prosecution. We therefore would have to find that [defendant] was in privity with the State of Missouri in order to estop [defendant] from relitigating the constitutional issue. Although Missouri courts have not addressed the precise problem confronting us, they have noted that privity does not exist merely because a person "happen[s] to be interested in the same question, or in proving or disproving the same state of facts." *American Polled Hereford Association v. Kansas City,* 626 S.W.2d 237, 241 (Mo. 1982). It is not enough that both the state and Schaeffer were interested in proving that probable cause existed to make the arrest and conduct the search and seizure.
>
> "[P]rivity within the meaning of the doctrine of issue preclusion is privity as it exists in relation to an identity of interests in the subject matter of the litigation." *Id.* The interests of the State of Missouri in a criminal proceeding are not identical to those of an individual officer such as [defendant]. In a different context, the Supreme Court noted: " '[T]he purpose of a criminal court is not to provide a forum for the ascertainment of private rights. Rather it is to vindicate the public interest in the enforcement of the criminal law while at the same time safeguarding the rights of the individual defendant.' " *Standefer v. United States,* 447 U.S. 10, 25, 100 S.Ct. 1999, 2008, 64 L.Ed.2d 689 (1980) (quoting *United States v. Standefer,* 610 F.2d 1076, 1093 (3d Cir.1979) (defendant accused of aiding and abetting in commission of criminal offense may be convicted despite the prior acquittal of the alleged perpetrator)). Only the State of Missouri, not Schaeffer, had an interest in the outcome of the criminal proceeding against Duncan; Schaeffer's personal interests were not at stake....

Moreover, [defendant] clearly had no control over nor did he substantially participate in control of the state's presentation of its case. *See* Restatement (Second) of Judgments § 39 (1982); *Davis v. Eide,* 439 F.2d 1077, 1078 (9th Cir.), *cert. denied,* 404 U.S. 843, 92 S.Ct. 139, 30 L.Ed.2d 78 (1971). [Plaintiff] asserts, for example, that [defendant] "was represented by a state prosecutor throughout the hearing..." Brief for appellant at 10. That assertion is not supported by the facts. The prosecutor represented the State of Missouri—not [defendant]. [Defendant] had no control over the prosecutor and did not make decisions with regard to the prosecution. [Defendant]'s role at the suppression hearing was simply that of a witness for the prosecution. He could not have appealed the state court's decision on the motion to suppress and he had no control over the prosecutor's decision to enter a nolle prosequi on the criminal charge. We hold, therefore, that [defendant] did not have a full and fair opportunity to litigate at the suppression hearing the constitutionality of the December 11, 1980 arrest and search of [plaintiff] and seizure of items from him.

*Duncan* at 52–53 (footnote omitted).

The principle that a prosecutor does not represent the interests of a police officer later subject to personal liability for damages also was a basis for the court's decision in *Nieblas v. Derbyshire,* 1996 WL 331086 (E.D.N.Y. filed June 11, 1996). Specifically, the court stated, "A witness is not a party to plaintiff's criminal prosecution.... In the earlier proceeding, neither defendant had (or should have, for that matter) a personal stake in the prosecution's outcome." *Id.* at *3 (citation omitted).

In addition, the court stated sound policy reasons for not applying collateral estoppel: the conflicts which would arise between police and prosecutors. One example is the case in which a prosecutor acquiesces in the unlawfulness of a search because other evidence is sufficient to obtain a conviction or because there is a risk of reversal. The holding that the search would be illegal would be binding on the officer despite the

fact that it was technically, not substantively, litigated, an unfair result for the policeman. On the other hand, if the prosecutor litigated the issue and lost, the unfairness to the officer can be eliminated only by pursuing an appeal, effectively putting the prosecution on hold during the resolution of collateral issues. *Id.*

A slightly different approach was taken by the Seventh Circuit in *Kraushaar v. Flanigan*, 45 F.3d 1040 (7th Cir.1995). In that case, an arrest for driving under the influence was quashed by state courts, after which the driver brought suit under § 1983. The plaintiff argued that the defendants were collaterally estopped from relitigating the issue of probable cause for the arrest. The Seventh Circuit held that arresting officers could not be found to be in privity with the state prosecutor when the officers were not even called as witnesses during the criminal proceedings (the prosecutor relied on an officer's report). *Id.* at 1050–1051. In its concluding statement, the court added that, not only did the officer not testify, he "did not have the opportunity to present testimony from other witnesses to corroborate his own observations," *id.* at 1051, and therefore did not have a full and fair opportunity to litigate the issue of probable cause.

■ These principles apply in this case. During the prosecution, Guida represented the interests of the Commonwealth, not the personal interests of the State Troopers, or even the personal interests of defendant Yatron, another prosecutor in the Office of the Attorney General. His goal was to obtain a conviction of Smith, and not the litigation of issues such as whether the lifters were *Brady* material, at least not directly. Moreover, once he learned that the lifters had been found, Guida decided not to disclose them because he did not feel that they were *Brady* material, a decision over which the Trooper defendants had no control.

After Graci had the case and was informed of the existence of the lifters, he concluded that they were *Brady* material subject to disclosure. Once again, the Trooper defendants had no control over the decision. Moreover, since Graci had concluded that the lifters were *Brady* material, the issue was

not litigated in the post-trial hearings. The question there was whether there was police and prosecutorial misconduct sufficient to bar a second trial. In combination with the suppression of the other evidence, i.e. the material which could have been used to impeach a Commonwealth witness, the state courts found such misconduct. However, although they may have testified in hearings related to the misconduct, defendants in this case had no say in the conduct of that litigation. The only defendant who had any authority in the matter, Yatron, properly left the litigation to the prosecutor handling the case, Graci.

Smith claims that the relationship between defendants and the prosecution was "symbiotic." Plaintiff's Brief at 9 n. 4. As discussed above, we disagree with this characterization. The close working relationship which necessarily exists between police and prosecutors does not change the fact that they are in different offices and perform distinct functions. Most importantly, even assuming such a symbiosis existed, the decision by Graci to concede that the lifters were *Brady* material undercut the relationship for present purposes.

■ Smith also argues that the court should adopt the holding of the state courts in the interest of comity. Comity does not outweigh the rights of individual defendants to litigate an issue. Finally, Smith mentions, without great development of the argument, that we are bound by the Full Faith and Credit Clause, U.S. Const. art. IV, § 1, to hold that the lifters were *Brady* material. *See also* 28 U.S.C. § 1738 (federal statute governing full faith and credit). A federal court is required to give preclusive effect, whether res judicata or collateral estoppel, to the judgment of a state court to the same extent as would be given under the law of the state. *In re General Motors Corp. Pick–Up Truck Fuel Tank Products Liability Litigation*, 134 F.3d 133, 141–142 (3d Cir.1998); *Avellino v. Herron*, 991 F.Supp. 722, 728 (E.D.Pa.1997). Pennsylvania applies the same principles of collateral estoppel as discussed above. *Avellino* at 728 (citing *Allegheny Int'l Inc. v. Allegheny Ludlum Steel Corp.*, 40 F.3d 1416, 1431 n. 17 (3d Cir.1994);

*Gregory v. Chehi,* 843 F.2d 111 (3d Cir. 1988)). For the same reasons that collateral estoppel does not apply, then, defendants are not barred by the principles of full faith and credit from litigating the issue of whether the lifters are *Brady* material.

We conclude that the use of offensive collateral estoppel is inappropriate. Policemen do not have any control over state prosecutors as to the conduct of criminal proceedings, and prosecutors represent the people of a state or county generally, not individual officials who may be subject to liability for damages at a later time. The issue in this case was not the focus of the earlier proceedings which Smith seeks to use offensively to collaterally estop relitigation of the issue. Permitting the use of collateral estoppel in this manner would place burdens on the state criminal proceedings in the form of unfairness to police or multiplying the proceedings. We hold that the doctrine of collateral estoppel does not apply in these circumstances.[4]

### (2) Question for Court or Jury

Smith next argues that the court erred in submitting to the jury the question of whether the lifters were *Brady* material. The first question asked of the jury on the verdict slip was, "Were the five lifters in question material and exculpatory evidence relative to the trial of plaintiff Jay C. Smith in April, 1986?" The jury answered "No" to this question.

■ We agree with Smith that the question of whether evidence constitutes *Brady* material is a mixed question of law and fact. *Bowen v. Maynard,* 799 F.2d 593, 610 (10th Cir.), *cert. denied,* 479 U.S. 962, 107 S.Ct. 458, 93 L.Ed.2d 404 (1986). Generally, questions related to *Brady* material would be determined by the court because motions to suppress and for discovery are made pretrial. *See generally* Fed.R.Civ.P. 12(b)(3), (4). It should be emphasized that such mo-

tions "are capable of determination without the trial of the general issue," Rule 12(b), i.e. the purpose for which a jury is selected, and therefore a jury would not be involved. Therefore, the lack of jury determination during the criminal proceedings does not foreclose determination by a jury in later, related, civil proceedings.

■ Smith contends that the determination is a technical one for which only the court is qualified. We disagree: The exculpatory nature of evidence is not difficult to discern. If the evidence favors the defendant in criminal proceedings, as by directly supporting the defendant's non-involvement or by supporting a theory of the case inconsistent with the prosecution's, it is exculpatory. A jury inherently makes such a determination in nearly every criminal case which reaches the verdict stage.[5]

In discussing materiality in the context of a false statement within the jurisdiction of a government agency, the Supreme Court pointed out that mixed questions of law and fact are "typically resolved by juries." *United States v. Gaudin,* 515 U.S. 506, 512, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995). It added, "Indeed, our cases have recognized in other contexts that the materiality inquiry, involving as it does delicate assessments of the inferences a reasonable decisionmaker would draw from a given set of facts and the significance of those inferences to him is peculiarly one for the trier of fact." *Id.* (internal punctuation and citations omitted).

Smith contends that the court indicated that the verdict would be treated as advisory and that the court would make the final determination on the issue of whether the lifters were *Brady* material. He also points to the parties' agreement that the issue was one for the court. Stipulation of the Parties filed August 17, 1998.

---

**4.** Smith makes several arguments in this regard based on the language of the opinion of the Supreme Court of Pennsylvania. We do not address that language or the opinion generally because it is not material to the issue of collateral estoppel and because the effect of the opinion is discussed below.

**5.** Discussed below is the case of *United States v. Gaudin,* 515 U.S. 506, 115 S.Ct. 2310, 132

L.Ed.2d 444 (1995). The Supreme Court pointed out in that case that a jury necessarily makes a legal determination when it finds a criminal defendant guilty or not guilty, because it must make the factual determination as to whether the defendant committed the acts constituting the elements of the offense and then must determine whether those acts constitute the offense. *Id.* at 512–513, 115 S.Ct. 2310.

Actually, the court indicated that it was not clear whether the issue was one for the court or for the jury, and that the parties had brought the matter to the court's attention at a late date. We took the matter under advisement and indicated that the issue would be submitted to the jury and, if we determined that the question was purely legal, the verdict would be treated as advisory. The court at no time made a final determination that the verdict would be advisory. Regardless, Smith was on notice that the factual basis for the ruling had to be established whether the court or the jury would make the final determination, and Smith cannot claim to have been prejudiced in any way from his misperception of the court's statement.

We conclude that the issue of whether the lifters constituted *Brady* material was properly submitted to the jury.

### (3) Weight of the Evidence

We next turn to the question of whether the evidence supported the jury's verdict. In so doing, we address both the questions numbered (3) and (4), above, because the question of the reasonableness of the verdict is the same whether returned by the jury or by the court.

■■■ Before turning to the potential effect of the lifters on the criminal trial, we examine first the nature of what was found and preserved on the lifters. According to Balshy, he noticed a "sparkle" when he examined the feet of Susan Reinert, and used the lifters to collect whatever material had caused the sparkle. He could not determine from examination of the lifters what the material was, and he conceded that he is not a forensic geologist or other scientist qualified to make that determination. Other testimony supported the fact that no evidence of value was visible on the lifters either with the

naked eye or with a magnifying glass used to examine fingerprints. When the lifters were found, the nature of the material obviously became a matter of significant concern. The lifters were found later to contain, in addition to extraneous matter which was mostly organic in nature, one crystal of quartz on two of the lifters. That is, of the five lifters, there was a total of two grains or crystals of quartz. Writing on the lifters indicates that the crystals were found on the left foot and the left foot heel. No quartz was found on the lifters used between the toes of Susan Reinert. The quartz that was found had to be examined microscopically.

The quartz was examined by two forensic geologists. One was Christopher Fiedler of the FBI laboratory in Washington, D.C. He concluded that the quartz was "common sand," probably originating from opal or amethyst. Mr. Fiedler testified that quartz is found over most of the earth's dry surface, perhaps as much as 65% of the earth's crust. He termed the material he found "ubiquitous," [6] and opined that he would find at least two crystals on the body or in the clothing of any person in the courtroom at the time that he testified.[7]

Also presented was a report of an expert retained by Smith's counsel for the hearings ordered by the Supreme Court of Pennsylvania. This expert was described by Smith's criminal defense counsel as preeminent in the field. He opined that the material was "consistent with" beach sand. This opinion was not contradicted by the FBI scientist, who also stated that the sand could have been beach sand.

From the expert testimony, all that one learns is that two grains of sand were found on Susan Reinert's feet, that a beach as a source of the sand could not be ruled out, but that most of the land surface of the earth is such sand and also cannot be ruled out. One

6. "**u.biq.ui.tous** ..., *adj.* existing or being everywhere, esp. at the same time; omnipresent ..." The Random House Dictionary of the English Language 2048 (2d ed.1987).

7. We enter this information in a footnote because it was not part of the record before the court. A search of *Internet sources* returned one which states, "Quartz is the most abundant mineral in the Earth's crust. Quartz has been found in

meteorites and in some rocks collected on the moon." DesertUSA, *Geology: The Varieties of Quartz* (visited August 26, 1998) <http://www.desertusa.com/mag98/mar/papr/geo_quartz.htm$. It appears, then, that having these crystals on one's feet is as indicative of a trip to the moon as a trip to the beach.

cannot conclude under these circumstances that Cape May was any more likely a source of the sand than Harrisburg or suburban Philadelphia (the location in which most of the participants in this drama resided).

If this evidence had been available to the defense at the time of trial, then, it adds virtually nothing, since the material on the lifters does not make it more likely that Susan Reinert was killed in the place in which the defense contended. If anything, the suggestion of sand, with the implication that it was beach sand in a substantial quantity and as strengthened by Guida's reaction to the suggestion, was stronger evidence than the lifters would have been.

Smith also points to the opinion of Graci and others at the Office of the Attorney General that the lifters were *Brady* material. That opinion may be contrasted with those attorneys within the Office who believed that the lifters were not *Brady* material. Obviously, lawyers (and courts) may disagree about such matters, and the opinion of one, or more than one, attorney is not binding on a court or jury. It should be noted that this jury was presented with Graci's viewpoint.

We conclude that the verdict was not against the weight of the evidence. We also conclude that, had the question been left to the court, we would have agreed with the jury's conclusion. We state as much both because of the suggestion that the issue should have been determined by the court and to emphasize that we see no basis to overturn the jury's verdict.

### IV. EVIDENCE OF FAILURE TO DISCLOSE

Smith next contends that a jury could not reasonably find that defendants Dove and Yatron did not intentionally suppress the lifters. Specifically, the jury was asked:

> Did defendant Victor Dove intentionally refrain from disclosing the existence of the lifters to the prosecutor before May 1, 1986? [8]

· · · · ·

> Did defendant Paul Yatron, after he learned of the existence of the lifters, intentionally refrain from disclosing the existence of the lifters to attorney Robert Graci or otherwise intentionally prevent him from learning of the existence of the lifters before July, 1988? [9]

Verdict Form at 3–4. The jury answered "No" to both of these questions.

Based on the answer to the first question, i.e. whether the lifters were *Brady* material, the answers to these questions do not affect the result, and we need not address the purported error.

### V. BIFURCATION, EVIDENCE OF GUILT, AND BURDEN OF PROOF

Smith next raises a number of related issues. At trial, evidence was admitted which related to the evidence presented in the criminal trial. This evidence served several purposes. First, it placed the suppression of the lifters into context to reflect their relative importance. Second, it showed the conduct of Holtz in conducting his investigation and reflected his mental processes. The latter would be relevant for purposes of determining whether the lifters were intentionally suppressed, and whether there was malice. Finally, this evidence is relevant for purposes of determining whether there was an actual injury warranting damages. *Cf. Carey v. Piphus,* 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978) (plaintiff entitled only to nominal damages absent showing of actual injury due to procedural due process violation; student-plaintiffs required to show actual injury in form of suspensions that were not justified before they could recover other damages).

■ For the most part, Smith's argument is obviated by our conclusion that the jury properly found that the lifters were not *Bra-*

---

8. Court's note. May 1, 1986, was the day after Smith's murder trial ended and the day Dove informed Holtz about finding the lifters. The lifters were given by Holtz to Guida the next day.

9. Court's note. July, 1988, was the time that Smith's defense counsel learned of the existence of the lifters.

*dy* material. This holding precludes a finding of a due process violation or resulting injury. The only manner in which the contested evidence can have resulted in prejudicial error is if the evidence somehow "tainted" the jury's consideration of the issue of the lifters as *Brady* material.

Smith contends that we should have bifurcated the trial for these purposes. That is, the jury should have been presented with evidence concerning only the lifters as *Brady* material and their suppression. The problem with this approach is that the jury would have been considering the lifters in a vacuum, without an explanation of the criminal proceedings as a whole and the relationship of the lifters to those proceedings. This method of proceeding would have been difficult considering the context-based analysis necessary under *Brady*. Moreover, the witnesses called by both Smith and the defense would have been the same, or at least would have overlapped substantially, in both phases of a bifurcated trial. That would have required re-calling witnesses from considerable distances.

At the time that Smith's motion to bifurcate the trial (or, potentially, trifurcate for due process violation, injury, and damages phases), we ruled that such would not facilitate the orderly presentation of the case to the jury. We do not believe that the jury was unable to consider the evidence of the lifters in the context of the trial without being overwhelmed or misled by evidence suggesting Smith's guilt, particularly given our instruction that the jury was not to determine guilt or innocence of the murder. In fact, the charge emphasized that the object of these proceedings was to determine whether Smith received a fair trial and not to determine whether Smith was guilty:

> In order to prove that a defendant performed acts which operated to deprive the plaintiff of his constitutional rights, the plaintiff is not required to prove that a defendant had the specific purpose or intent of depriving him of those rights, or that a defendant acted with some particular constitutional right in mind. It is only necessary that the plaintiff prove, again by a preponderance of the evidence as to each defendant[,] that he intentionally acted in a way that did in fact operate to deprive the plaintiff of his right to a fair trial, that is, that he intentionally suppressed evidence that was material and exculpatory.

.   .   .   .   .

> In a case involving the kind of misconduct alleged here, the law does not require the plaintiff to prove to you that he was innocent of the murders with which he was charged, nor does the law require the defendants to prove to you that he was guilty. And by giving you these instructions I am not implying anything about whether the plaintiff is guilty or innocent.
>
> I further charge you that the defendants cannot assert as a defense that at the time of their actions they believed he was guilty of murder. A state official's duty to refrain from suppressing material and exculpatory evidence does not depend upon the official's state of mind or his subjective intentions. It is an objective duty which exists regardless of what the official may think.

N.T. 9/2/98, Exhibit 8 to Plaintiff's Post–Trial Motion (court's final charge to the jury).[10]

We conclude that the admission of evidence presented by the prosecution during the criminal trial and denial of the motion to bifurcate do not constitute a basis for a new trial.

## VI. OTHER EVIDENTIARY RULINGS

■ Smith reiterates objections to various rulings on the admissibility of evidence. The first is an objection to the admission of his prior convictions as impeachment material. We permitted the defense to use the convictions as such because Smith himself introduced evidence of the convictions to show that he was peculiarly vulnerable to accusations of murder. We held that defense counsel could use the convictions to impeach Smith's testimony. We fail to see error in permitting such use of evidence admitted substantively. Moreover, we fail to see unfairness in permitting the defense to use

---

**10.** The need for actual injury is discussed later in    the charge.

evidence which Smith introduced, while there is unfairness in using Fed.R.Evid. 609, governing the admissibility of prior convictions for impeachment purposes, as a sword rather than as the shield it was intended to be.

Smith also objected to the admission of an audiotape of a conversation between Smith and an informant, recorded without Smith's knowledge, in which Smith agreed with a suggestion by the informant that Smith's alleged co-conspirator, Bradfield, should be murdered and his body hidden. This recording fell within the general category of inculpatory evidence discussed above. Moreover, Smith was able to attack the recording as having been the fruit of the informant's prodding, one of many such recorded conversations (this being the only recording with inculpatory material) and of little value. We see no prejudicial error in its admission.

■ Related to Smith's arguments about the lifters is a contention that the opinion of the Supreme Court of Pennsylvania should have been admitted into evidence. The facts that the Supreme Court had found the lifters to be *Brady* material, that it had found police and prosecutorial misconduct, and that it had barred a second trial were presented to the jury. We fail to see how the legal reasoning underpinning the Supreme Court's holdings constitutes "evidence" for the jury's consideration. In essence, Smith's arguments amount to an attempt to present the strong language used by the Supreme Court for the purpose of coloring their view of defendants personally. Simply stated, the opinion is not evidence and did not belong in front of the jury.

## VII. CONCLUSION

The question of whether the lifters were *Brady* material was a mixed question of law and fact for the jury. The jury had a reasonable basis for concluding that the lifters were not material and exculpatory evidence under *Brady*. Even if the question were solely for the court, we agree with the verdict of the jury. Smith's other claims of error do not warrant a new trial or setting aside the jury's

verdict, and the post trial motion will be denied.