

2000 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-13-2000

# Smith v. Holtz, et al.

Precedential or Non-Precedential:

Docket 99-7046

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2000

Recommended Citation

"Smith v. Holtz, et al." (2000). *2000 Decisions.* Paper 78.
http://digitalcommons.law.villanova.edu/thirdcircuit_2000/78

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2000 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed April 13, 2000

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 99-7046

JAY C. SMITH,

      Appellant

v.

JOHN J. HOLTZ, Bureau of Technical Services,
Pennsylvania State Police; RONALD F. COYLER,
Bureau of Technical Services, Pennsylvania State
Police; VICTOR DOVE; JOHN J. PURCELL,
Special Agent in Charge, Central Regional Office,
Bureau of Criminal Investigations, Office of the
Attorney General; WILLIAM J. LANDER, Bureau
of Criminal Investigations, Office of the Attorney
General; PAUL YATRON

Appeal from the United States District Court
for the Middle District of Pennsylvania
Civil No. 93-cv-01428
District Judge: Hon. James F. McClure, Jr.

Argued: July 27, 1999

Before: SLOVITER, NYGAARD and McKEE, Circuit  Judges

(Filed: April 13, 2000)

GERALD J. WILLIAMS, ESQ.
 (Argued)
Williams & Cuker
One Penn Center at Suburban
 Station
1617 JFK Boulevard, Suite 800
Philadelphia, PA 19103

LESLIE M. FIELDS, ESQ.
Costopoulos Foster & Fields
831 Market Street
P. O. Box 222
Lemonye, PA 17043
Attorneys for Appellant

D. MICHAEL FISHER, ESQ.
Attorney General
GREGORY R. NEUHAUSER, ESQ.
 (Argued)
Senior Deputy Attorney General
CALVIN R. KOONS, ESQ.
Senior Deputy Attorney General
JOHN G. KNORR, III, ESQ.
Chief Deputy Attorney General
Office of the Attorney General
15th Floor, Strawberry Square
Harrisburg, PA 17120
Attorneys for Appellees

OPINION OF THE COURT

McKEE, Circuit Judge.

Jay C. Smith, the former principal of Upper Merion High School in Upper Merion, Pennsylvania, appeals from a jury verdict in favor of defendants in the civil rights suit he filed under 42 U.S.C. S 1983. The suit arose from an infamous murder and prosecution that were the subjects of books by noted author, Joseph Wambaugh, as well as Smith's criminal defense attorney. The prosecution also generated a host of criminal and civil litigation. See Smith v. Holtz, 30 F. Supp.2d 468, 471 (E. D. Pa. 1998)(collecting cases).

2

In 1986, Smith received three death sentences following conviction for the murder of Susan Reinert and her two children. Reinert had been an English teacher at Upper Merion High School while Smith had been the principal. The Pennsylvania Supreme Court subsequently vacated Smith's murder convictions, and remanded for a new trial because prejudicial hearsay had been improperly admitted during his trial. However, before Smith could be retried, he learned that the prosecution had not disclosed certain evidence that Smith claimed was exculpatory. The trial court found prosecutorial misconduct, but refused to bar retrial. However, on appeal of that decision, the Pennsylvania Supreme Court held that the double jeopardy clause of the Pennsylvania Constitution prohibited retrial, and ordered Smith's release.

Thereafter, Smith filed the instant civil rights action. He alleged that the defendants' deliberate suppression of exculpatory evidence violated the holding of Brady v. Maryland, 373 U. S. 83 (1963), and that he was therefore entitled to compensation for the resulting denial of his constitutional right to due process of law. The jury returned a verdict in favor of all of the defendants, and the District Court denied Smith's post-trial motions. Smith v. Holtz, 30 F. Supp.2d 468 (E. D. Pa. 1998). This appeal followed. We will affirm.

I. BACKGROUND1

The events leading to Smith's criminal prosecution began to unfold on Monday, June 25, 1979, at about 5:20 a. m., when a police officer found Susan Reinert's nude body in the hatchback trunk of her car. "The body showed evidence that Ms. Reinert had been chained and beaten, and her nude body was left lying in the fetal position in the back of her car. . . ." Id. at 471. At the time of her death, Reinert taught English at Upper Merion High School.

A forensic pathologist examined Reinert's body and
_____

1. Our recitation of the facts is taken from the reported opinions of the Pennsylvania Supreme Court, the Pennsylvania Superior Court and the United States District Court for the Middle District of Pennsylvania.

3

"determined that Ms. Reinert had sustained massive hemorrhaging in the eye area and abrasions over her body. He also opined that certain prominent bruises on the back of the body . . . were consistent with the imprint of a chain. The cause of death was determined to be asphyxiation from an overdose of morphine, which was consistent with having been caused by criminal agency." Commonwealth v. Smith, 568 A.2d 577, 583 (Pa. 1989). The pathologist opined that Reinert's death probably occurred during the morning hours of Sunday, June 24, 1979. Id.

Mary Grove, Reinert's next door neighbor, and Ms. Grove's granddaughter, Beth Ann Brook, saw Reinert and her two young children, Michael (age 10), and Karen (age 11) on Friday, June 22, 1979, at about 9:20 p. m., on Reinert's front porch. Shortly thereafter, Ms. Grove and Beth Ann heard Reinert and her children drive away in Reinert's car. Beth Ann noticed that Karen was wearing a small green pin with a white "P". This was the last known time that anyone saw Michael or Karen Reinert. Id. at 548.

Following the discovery of Susan Reinert's body, the local and state police conducted an extensive search in an effort to locate Michael and Karen. Karen and Michael had close relationships with their father -- who was divorced from their mother -- and their paternal grandmother. Both children knew where their father and paternal grandmother lived, and both children knew how to reach them by telephone. Id. at 587. However, neither the father nor the paternal grandmother ever heard from the children after June 22, 1979.

In addition to the search by local and state police, the Federal Bureau of Investigation opened a "missing persons case" and assigned eighteen agents full-time to a nationwide search that lasted five months. However, neither the FBI nor the state or local police ever found a trace of either of the two missing children. Id. at 587.

Soon after Reinert's body was discovered, suspicion focused on William Bradfield (who was also an English teacher at Upper Merion High School), and on Smith. Police were eventually able to build a case against Bradfield, and he was charged with the murders of Reinert and her two

4

children. In 1983, a jury convicted him of those murders, and he was thereafter sentenced to three consecutive life sentences. See Commonwealth v. Bradfield, 508 A.2d 568 (Pa. Super. 1986). Bradfield died in prison in 1998 without ever disclosing the location of the bodies of the Reinert children.

In 1986, three years after Bradfield's trial, Smith was arrested and also charged with the Reinert murders based upon evidence that he had conspired with Bradfield.[2] During the ensuing trial, the Commonwealth introduced evidence that Bradfield had been involved in a romantic relationship with Reinert from 1973 until the time of her death. Reinert had made Bradfield the primary beneficiary under her will, the sole beneficiary of her $730,000 in life insurance, and the guardian of her children in the event of her death. She did all this because she believed Bradfield's promise that he would marry her. However, unbeknownst to Reinert, Bradfield had a lover named Susan Myers. Bradfield told his friends and Myers that he was not interested in Reinert even though Reinert was enamored with him. Commonwealth v. Smith, 568 A.2d at 604.

As noted above, Smith was the principal of the high school where both Reinert and Bradfield taught. Smith's relationship with Reinert appeared to be strictly professional, but his relationship with Bradfield was quite nefarious. The Commonwealth's theory during Smith's prosecution was that Smith and Bradfield conspired to kill Reinert so they could share in her life insurance proceeds, and the testamentary assets that would go to Bradfield upon Reinert's death. The Commonwealth believed that Bradfield and Smith abducted Reinert and her two children pursuant to that conspiracy, and that Smith then killed them somewhere in Pennsylvania. Smith v. Holtz , 30 F. Supp.2d at 473.

According to the Commonwealth, the illicit relationship between Smith and Bradfield began shortly after Smith's arrest on charges of theft. Smith had been charged with

_____

2. At the time of his arrest, Smith was in prison for convictions for theft
by deception, receiving stolen property, possession of a firearm without a license and possession of marijuana. Attorney General's Br. at 8.

5

theft from a Sears in St. David's Mall in Montgomery County, Pennsylvania, in August of 1977, and Bradfield had been Smith's alibi witness at Smith's theft trial. Commonwealth v. Smith, 568 A.2d at 604. The Commonwealth theorized that Bradfield's alibi testimony had been perjured, and that Smith's motives for killing Reinert included preventing her from disclosing that his defense had consisted of perjured testimony.[3]

During Smith's murder trial, the Commonwealth contended that Smith and Bradfield formed their conspiracy to kill Reinhert and her children sometime after the theft trial. Although Bradfield's testimony had established Smith's alibi, the Commonwealth introduced testimony during Smith's murder trial that established that, contrary to Bradfield's alibi testimony, Smith had actually been inside the Sears store when the theft occurred. Id. That evidence was introduced at Smith's murder trial to demonstrate the nature of the relationship between Bradfield and Smith.

The Commonwealth also introduced physical evidence that linked Smith to the Reinert murders. A green pin with a white "P", similar to the one that Beth Ann Brook saw Karen Reinert wearing on June 22, 1979, was recovered from under the front seat of Smith's car. A hair similar to Susan Reinert's was found inside Smith's home, and testimony was offered to establish that fibers found on Reinert's body were similar to fibers from a carpet in the basement of Smith's home. In addition, Smith's former military reserve unit was named 79 USARCOM, and a comb imprinted with "79 USARCOM" was found in Reinert's car under her body. The prosecution also introduced a bag of identical combs that had been recovered from Smith's home. Finally, the prosecution introduced a letter that Smith had written to his wife while he had been incarcerated on the theft charges. In that letter, Smith asked her to dispose of the carpet in their home (the one

_____

3. It is not clear why Smith would be that concerned with Bradfield's perjury being disclosed. Inasmuch as the jury convicted Smith despite Bradfield's alibi testimony, the jury clearly rejected that testimony, and Smith's alibi defense.

6

with fibers similar to fibers found on Reinert's body), and clean the interior of his car (where Karen Reinert's pin was later found). Id.

The Commonwealth also presented the testimony of two inmates who had been incarcerated with Smith. One inmate testified that Smith asked him to kill state police detectives investigating the Reinert murders. The other testified that Smith had confessed his complicity in the Reinert murders to him, and that Smith had admitted to killing Reinert both for money and because he was afraid she would reveal that Bradfield had offered perjured alibi testimony. Id. at 605.

Bradfield was not called as a witness during Smith's murder trial. Nonetheless, the Commonwealth was allowed to present the testimony of several people who were either Bradfield's close friends or lovers. The first of these witnesses was Vincent Valaitis, another English teacher at Upper Merion High School. Valaitis testified that Bradfield told him in the fall of 1978 that he (Bradfield) had volunteered to serve as an alibi witness at Smith's theft trial. Valaitis also testified about several conversations he had with Bradfield in which Bradfield made statements incriminating Smith and suggesting that Smith was a Mafia hitman. Id. at 606. Valaitis said that Bradfield had urged him to join Bradfield, Susan Myers, and another teacher, Chris Pappas, on a trip to the seashore resort of Cape May, New Jersey, on the weekend that Reinert was killed. Valaitis claimed that Bradfield told the group that Smith was going to kill Reinert during that weekend and that their presence with Bradfield in Cape May would give him an alibi. Id. Chris Pappas was allowed to testify that Bradfield said that Smith had gone through with his threats and killed Reinert after he learned of Reinert's death. Id.

Other witnesses, including Susan Myers, also testified about conversations they had with Bradfield in which Bradfield described Smith's murderous intentions. Still other witnesses were allowed to testify about other out-of-court statements Bradfield had made, including statements that Smith was mentally unstable, that Smith intended to kill several persons including Reinert, and that Smith

7

wanted to kill anyone remotely connected with the Reinert investigation.

Smith did not testify in his own defense. However, he attempted to construct a defense around the theory that Bradfield had killed Reinert at the beach in Cape May, New Jersey, where Bradfield, Myers and Pappas were when the murders occurred.

Smith's instant civil rights suit arises from the testimony of Corporal John Balshy, a Pennsylvania State Trooper who testified for the Commonwealth. Corporal Balshy was one of the investigators assigned to the Reinert investigation, and he had been present during Reinert's autopsy. He testified that before the autopsy began, he examined Reinert's body for physical evidence, and found the red fibers that were subsequently linked to the carpet in Smith's home. He also testified that he noticed what he termed a "sparkle" on the feet of Susan Reinert, and that he used rubber "lifters" to collect the material from her feet. Smith v. Holtz, 30 F. Supp.2d at 472.[4] He used a total of five lifters to collect material. He testified that two lifters each contained one grain of this "sparkle" material, and that the material was lifted from Reinert's left foot and left heel.[5] Balshy said that he thought that the material lifted from Reinert's feet was dust or lint that was of no evidentiary value, but he conceded that it "could have been sand."[6] Id. at 473. Balshy

_____

4. The lifter is a flat piece of rubber with adhesive on one side. When used, a clear piece of cellophane is removed to expose the adhesive surface. The lifters are so named because they usually are used to "lift" fingerprints from a crime scene. Smith v. Holtz, 30 F. Supp. at 472.

5. The precise location of this material is not clear. During Smith's murder trial Balshy "testified on cross-examination that he had used the . . . lifters to remove granular particles which looked like sand from between the victim's toes." Commonwealth v. Smith, 615 A.2d at 182. However, testimony during the trial on the instant civil rights complaint caused the District Court to conclude, "[n]o[particles] were found on the lifters used between the toes of Susan Reinert." Smith v. Holtz, 30 F.Supp 2d at 478.

6. This testimony was given on cross-examination. During the trial of Smith's S 1983 claims, William C. Costopoulos, Smith's criminal defense counsel, testified that he had known beforehand that Balshy would

gave the lifters to State Trooper Ronald F. Coyler, who was collecting evidence during the investigation. Id. The existence of sand on Ms. Reinert's feet supported Smith's theory that Reinert was killed at the seashore. However, the Commonwealth did not disclose the existence of the lifters to Smith or his trial counsel and they were never introduced into evidence.

The District Court concluded that the prosecutor, Richard Guida of the Office of the Attorney General of Pennsylvania, did not know of the lifters during the trial. 30 F. Supp.2d at 473. However, the Pennsylvania Supreme Court concluded otherwise. That Court concluded that Guida knew of them during the trial, and that he realized their importance to the defense (though it is still not clear exactly when the Court believed he first learned of them). The Pennsylvania Supreme Court stated:

> The adhesive "lifters" used to remove and retain the sand from between the victim's toes were discovered by the Commonwealth during appellant's trial but were not disclosed to appellant despite the prosecutor's awareness of their importance. This is established by a mid-trial memorandum from the assistant attorney general who prosecuted appellant to his superior, the executive deputy attorney general stating: "It is obvious from [defense counsel's] tactics thus far that he will attempt to establish that Mrs. Reinert was killed at the shore in Cape May, New Jersey by William Bradfield, Chris Pappas, and Susan Myers. The sand, therefore, is extremely material to the defense case."

_____

testify about finding something that could have been sand on Reinert's feet. Balshy retired from the state police in 1981 and began working as a private investigator. Apparently, Balshy provided investigative services to a member of Costopoulos' firm before Costopoulos was appointed to represent Smith as defense counsel. It was as a result of Balshy's work for Costopoulos' firm that Costopoulos learned about the lifters and learned of Balshy's observations. However, despite that knowledge, Costopoulos did not ask the Commonwealth to produce the lifters. App. 520a-522a.

We take no position on whether defense counsel's failure to demand the lifters precludes Smith's S 1983 claim.

Commonwealth v. Smith, 615 A.2d 321, 323 (Pa. 1992) (emphasis added). However, regardless of when Guidafirst learned about the lifters, it is clear that Guida honed in on Balshy's testimony about lifters and attacked Balshy's credibility during Smith's murder trial despite the damning nature of so much other physical and circumstantial evidence establishing Smith's guilt. Guida went so far as to imply that Balshy had fabricated testimony and planted the lifters and particles after the autopsy. Id. Guida also presented the testimony of other State Troopers who were present at Reinert's autopsy who remembered nothing about sand or lifters. During his summation, Guida even argued that Smith had paid Trooper Balshy to concoct his testimony.7 Id.

After the Commonwealth rested its case, State Trooper Victor Dove was assigned the duty of gathering up evidence. 30 F.Supp.2d at 473. On April 24, 1986, while gathering the evidence, he found the lifters in an evidence locker at the barracks of the state police. 615 A.2d at 323. According to the District Court, Dove waited one week, until May 1, 1986, the day after Smith's trial ended, before he told John Holtz –– the chief State Police investigator assigned to the case –– of the discovery. 30 F. Supp.2d at 473. Holtz immediately contacted Guida, who told Holtz to bring him the lifters the next day. Holtz did so, but Guida still did not disclose their existence to Smith's counsel. Rather, the lifters were turned over to the State Police Bureau of Professional Responsibility which, at Guida's recommendation, was conducting an investigation into Balshy's possible perjury. Id. That investigation was being conducted by Paul Yatron, Executive Director of the Attorney General's Office, and by Special Agent John Purcell, also of the Attorney General's Office. However, Yatron also failed to disclose the existence of the lifters to Smith's counsel.

_____

7. Guida also recommended to the Deputy Executive Attorney General that Balshy be investigated for possible perjury charges. 615 A.2d at 323. However, investigations conducted after the trial by the state police and the Office of the Attorney General concluded that there was no evidence of perjury or falsification of evidence by Balshy. Id. at 324.

10

Smith was convicted of the first-degree murders of Reinert and her children on April 30, 1986. However, just before sentencing, he filed a motion for a new trial based on after discovered evidence. He alleged that the prosecution allowed Raymond Martray (one of the inmates who testified for the Commonwealth) to testify without disclosing that Martray had open criminal charges, and expected leniency in return for testifying against Smith.

> Specifically, [Smith] learned that the Commonwealth's chief witness [Martray], who denied the existence of any bargain in exchange for his testimony against [Smith], was in fact awaiting sentencing for unrelated crimes and did in fact receive favorable treatment by the Commonwealth at his sentencing. [Smith] was thereby precluded from impeaching Mr. Martray's veracity by exposing his motivation to testify falsely against appellant in order to minimize his own punishment.

615 A.2d at 323. After an evidentiary hearing, the trial court concluded that the prosecution's misconduct did not warrant a new trial and it denied Smith's motion. Id. Thereafter, Smith was sentenced in accordance with the jury's earlier verdicts.

Smith's death sentences were subject to automatic review by the Pennsylvania Supreme Court;[8] and on appeal, Smith raised nineteen claims of error that he argued required a new trial. These included challenges to the sufficiency of the evidence, the admission of numerous hearsay statements, and the Commonwealth's failure to disclose Martray's pending criminal prosecution. 568 A.2d at 605–606.

By the time Smith's appeal was decided, Guida had resigned from the Attorney General's Office and another Assistant Attorney General, Robert Graci, had been assigned to represent the Commonwealth during the appeal process. In July of 1988, Graci first learned that the lifters existed. He immediately recognized their implication and

_____

8. See S 9711(h) of the Pennsylvania Sentencing Code, 42 PA. CONST. ST. ANN. S 9711(h).

11

importance, and concluded that the lifters had to be disclosed to Smith's counsel. Executive Director Yatron did not agree that the lifters had to be disclosed, but he did not attempt to dissuade Graci from doing so. Accordingly, on July 12, 1988 -- more than two years after Smith's convictions for the Reinert murders -- the Commonwealth officially informed Smith's counsel of the existence of the lifters. 615 A.2d at 324; see also Smith's Br. at 7.

That disclosure prompted Smith's counsel to file a motion in the Pennsylvania Supreme Court requesting that Smith's sentences be vacated based upon prosecutorial misconduct. Smith also argued that the constitutional guarantee against double jeopardy prevented his retrial. When the motion was filed, the Pennsylvania Supreme Court had not yet decided the merits of Smith's automatic direct appeal. Inasmuch as the record did not contain the circumstances surrounding the concealment of the lifters or the Commonwealth's alleged deal with Martray, the Supreme Court remanded the matter to the trial court for an evidentiary hearing on both issues. On remand, the trial court denied Smith any relief though it concluded that the prosecution had been guilty of serious misconduct. The trial court then forwarded its findings and conclusions of law to the Pennsylvania Supreme Court. 591 A.2d at 731.

On December 22, 1989, the Pennsylvania Supreme Court reversed Smith's convictions and granted him a new trial on grounds unrelated to the lifters or Martray's testimony. Commonwealth v. Smith, 568 A.2d 600 (Pa. 1989). It found that the evidence was sufficient to sustain Smith's convictions, Id. at 605, but held that allowing the aforementioned prejudicial hearsay statements into evidence constituted reversible error. Id. at 605-609. Inasmuch as that error warranted a new trial, the Court did not consider whether the Commonwealth's suppression of the lifters would also require a new trial. Instead, it noted that "[t]his evidence will now be available at a subsequent trial, and the jury will be given the opportunity to assess its import within the totality of the evidence presented." Id. at 610 n.8.

However, Smith was never retried. On remand, Smith once again filed a motion arguing that the guarantee

against double jeopardy prohibited retrial. The trial court denied that motion, and the Superior Court affirmed. Commonwealth v. Smith, 519 A.2d 730 (Pa. Super. 1991). However, the Pennsylvania Supreme Court reversed despite its earlier statement that the lifters would be available at any subsequent trial. The Court held that prosecutorial misconduct barred Smith's retrial under the double jeopardy clause of the Pennsylvania Constitution, and the Court ordered Smith's discharge. Commonwealth v. Smith, 615 A.2d 321 (Pa. 1992). In doing so the Court stated:

> It is a gross understatement to conclude, as stated by the trial court and Superior Court that "neither the Attorney General's Office nor the Pennsylvania State Police can take any great pride in the manner in which this case was handled during the trial and on appeal." Deliberate failure to disclose material exculpatory physical evidence during a capital trial, intentional suppression of the evidence while arguing in favor of the death sentence on direct appeal, and the investigation of Corporal Balshy's role in the production of the evidence rather than its own role in the suppression of evidence constitute prosecutorial misconduct such as violates all principles of justice and fairness embodied in the Pennsylvania Constitution's double jeopardy clause.

Id. at 324 (citation omitted).

Smith was released from prison on September 18, 1992.

II. DISTRICT COURT PROCEEDINGS

On September 15, 1993, Smith filed the instantS 1983 claim against State Troopers John Holtz, Ronald Coyler and Victor Dove; and Paul Yatron, John Purcell and William Lander of the Office of the Pennsylvania Attorney General.9 He alleged that the defendants had deprived him of rights guaranteed under the Fifth, Sixth and Fourteenth Amendments of the United States Constitution by deliberately concealing the lifters during his criminal trial,

_____

9. Lander was the Assistant Director of the Bureau of Criminal Investigation of the Attorney General's Office.

13

and his direct appeal.10 After extensive pretrial motions not relevant to this appeal, the suit proceeded to trial. At trial, over Smith's objection, the District Court allowed the jury to determine whether the lifters were material and exculpatory evidence under Brady v. Maryland. The issue was submitted to the jury in the form of a special interrogatory. The claims against the remaining defendants, (Holtz, Dove and Yatron), were also submitted to the jury in the form of special interrogatories.

The jury found that the lifters were not material and exculpatory evidence, and returned answers to all special interrogatories in favor of the defendants. Thereafter, the District Court directed the entry of judgment in favor of the defendants. Post-trial motions were denied, Smith v. Holtz, 30 F. Supp.2d 468 (M. D. Pa. 1998), and this appeal followed.

III. DISCUSSION

Smith first argues that the District Court erred in failing to rule as a matter of law that the lifters were material and exculpatory under Brady. Second, he argues that the District Court erred in not deferring to the Pennsylvania Supreme Court's holding that the lifters were exculpatory under Brady. He also argues that the District Court erred in allowing the jury to determine whether the lifters were material and exculpatory evidence; though this is merely a restatement of his second argument. Third, he argues that even if that issue was properly submitted to the jury, the District Court erred in not informing the jury of the Pennsylvania Supreme Court's rulings on the Brady issue. Finally, Smith argues that the District Court erred in refusing to grant his motion for a new trial.

By itself, S 1983 does not create any substantive rights, but it does provide a remedy for violation of rights created by the Constitution. Baker v. McCollan, 443 U. S. 137, 144

_____

10. The civil rights claims did not include any cause of action based upon the perjured testimony of Martray, and Smith voluntarily dismissed his claims against Lander and Coyler prior to trial. He voluntarily dismissed his claim against Purcell during the trial.

14

n.3 (1979). Thus, Smith can not prevail on his S 1983 claim unless he can establish the denial of a constitutional right. See Parratt v. Taylor, 451 U. S. 527 (1981). The constitutional deprivations that he alleges rest squarely upon the disclosure requirements of Brady. If suppression of the lifters does not amount to a constitutional violation under Brady, Smith can not establish a cause of action under S 1983. Accordingly, we begin our analysis with a review of Brady v. Maryland and its progeny.

In Brady v. Maryland, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. The Court subsequently held that the prosecution's duty to disclose favorable evidence is not dependent upon a request from the accused. United States v. Agurs, 427 U. S. 97, 107 (1976).11 Evidence is favorable to the accused under Brady "if it would tend to exculpate him or reduce the penalty. . . ." Id. at 87–88. The duty of disclosure is not limited to evidence the prosecutor is aware of. Rather, it includes "evidence known only to police investigators and not to the prosecutor." Kyles v. Whitley, 514 U. S. 419, 438 (1995). Thus, under Brady, "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." Id. at 437.

Even though this duty of disclosure is tightly tethered to constitutional guarantees of due process, "the Constitution is not violated every time the government fails or chooses not to disclose evidence that might prove helpful to the defense." Id. at 436–37 (citation omitted). Rather, the prosecution's failure to disclose evidence rises to the level of a due process violation "only if the government's evidentiary suppression undermines confidence in the outcome of the trial." Id. at 434. Thus, "[t]he question is not whether the

_____

11. The affirmative duty to disclose reaches impeachment evidence as well as exculpatory evidence. United States v. Bagley, 473 U. S. 667, 676 (1985).

defendant would more likely than not have received a different verdict with the [concealed] evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Id.

Here, the jury determined that the lifters were not subject to disclosure under Brady, and the District Court agreed. The court stated, "Smith's argument is obviated by our conclusion that the jury properly found that the lifters were not Brady material." 30 F. Supp. 2d at 479-80. The court concluded that the lifters were not subject to Brady disclosure because they were not material, and the court reasoned that they weren't material because concealment of them did not diminish confidence in Smith's murder convictions. The District Court stated, "[e]vidence is material if its suppression undermines confidence in the outcome of the trial." 30 F.Supp. 2d at 473 (citing Bagley, 473 U.S. 667, 678 (1985)). However, the District Court's analysis improperly conflates two separate and independent components of Brady into a single inquiry. The question of whether the prosecution must disclose evidence, i.e. whether the evidence is Brady material, must be determined independently of an inquiry into whether suppression of that evidence undermines confidence in the outcome of a criminal trial, i.e., whether the evidentiary suppression constitutes a Brady violation.

Following oral argument before us in this case, the Supreme Court clarified this distinction between Brady material, and a Brady violation. In Strickler v. Greene, ___ U. S. ___, 119 S. Ct. 1936 (1999), the Court wrote:

> [T]he term "Brady violation" is sometimes used to refer to any breach of the broad obligation to disclose exculpatory evidence -- that is, to any suppression of so-called "Brady material" -- although, strictly speaking, there is never a real "Brady violation" unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict. There are three components of a true Brady violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed

>     by the State, either willfully or inadvertently; and
>     prejudice must have ensued.

Id. at 1948.12

Evidence of sand on Ms. Reinert's feet is certainly consistent with Smith's claim that she was killed at the seashore -- where Bradfield was on the weekend of her death. As noted above, the prosecutor clearly thought such evidence exculpatory, and stated as much in the memorandum he wrote mid-trial. The prosecutor believed that when viewed in context with Smith's trial tactics, "[i]t is obvious . . . that . . . [t]he sand . . . is extremely material to the defense case." 615 A.2d at 323. The Pennsylvania Supreme Court also concluded that the lifters were favorable to the defense. See Id. at 324 (Condeming the prosecution's "[d]eliberate failure to disclose material exculpatory physical evidence during a capital trial.").

We agree that the lifters were Brady material, and we therefore disagree with the District Court's ruling to the contrary. See 30 F. Supp.2d at 479 (Agreeing with jury's determination that the lifters did not constitute Brady material). However, we nevertheless conclude that the District Court's ultimate holding that Smith failed to establish a Brady violation was correct. 13

Smith repeatedly claims that the lifters were material and, therefore, that their concealment violated his due process right to a fair trial.14 However, Smith's argument

_____

12. The District Court here obviously did not have the benefit of the holding in Strickler during the course of this trial.
13. Inasmuch as we hold that Smith failed to establish a due process violation, we need not now determine if the District Court erred in allowing the jury to determine if the lifters were"material and exculpatory."

14. Although the affirmative duty to disclose is placed upon the prosecutor, we will nonetheless assume for the purposes of this appeal that investigating police officers also have an affirmative duty to disclose
exculpatory evidence to an accused if only by informing the prosecutor that the evidence exists. But see Kelly v. Curtis, 21 F.3d 1544, 1552 (11th Cir. 1994). We will further assume that aS 1983 claim alleging a due process violation under Brady can, therefore, be asserted against police officers. See McMillian v. Johnson, 88 F.3d 1554, 1567 n.12 (11th Cir. 1996), amended, 101 F.3d 1363 (11th Cir. 1996).

confuses "Brady material" with the Brady materiality standard required to establish a due process violation. Evidence "is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A `reasonable probability' is a probability sufficient to undermine confidence in the outcome." United States v. Bagley, 473 U. S. at 678.

The lifters containing two grains of quartz crystals that could have been beach sand were favorable to Smith. They were exculpatory to the extent that they corroborated his contention that Bradfield killed Reinert at the Cape May shore. Thus, the Commonwealth had an affirmative duty to disclose them to Smith, and the Pennsylvania Supreme Court so held. We share that Court's condemnation of the prosecutorial misconduct that occurred here. The reprehensible and unethical conduct of some of those involved in that prosecution is not, however, relevant to our inquiry in determining if Smith has made out his cause of action under S 1983. Despite the prosecutorial misconduct, Smith must establish the prejudice required for the due process violation that is the sine qua non of his claim for relief. He has not done so.

Balshy testified at the civil trial as he had at Smith's criminal trial. He told the jury about noticing the sparkle on Reinert's feet and using the lifters to collect them. Although he testified at Smith's criminal trial that the material could have been sand, he testified at the trial in the instant suit that he was not qualified to make a scientific determination as to the exact nature of the material. Other witnesses testified that the material was quartz and that it was "ubiquitous" on the earth's surface.

The District Court described the testimony as follows:

> The quartz was examined by two forensic geologists. One was Christopher Fiedler of the FBI laboratory in Washington, D.C. He concluded that the quartz was "common sand," probably originating from opal or amethyst. Mr. Fiedler testified that quartz is found over most of the earth's dry surface, perhaps as much as 65% of the earth's crust. He termed the material he

18

found "ubiquitous," and opined that he wouldfind at least two crystals on the body or in the clothing of any person in the courtroom at the time he testified.

30 F. Supp. 2d at 478. In a supplemental footnote, the court noted: "a search of internet sources" discovered one reference that concluded: " `Quartz is the most abundant mineral in the Earth's crust. Quartz has been found in meteorites and in some rocks collected on the moon.' " Id. at n.7.15 The court then summarized its assessment of the impact that withholding such evidence had on the integrity of Smith's murder convictions as follows: "It appears then that having these crystals on one's feet is as indicative of a trip to the moon as a trip to the beach." Id . Although the court was clearly engaging in hyperbole, we nevertheless share its conclusion that the post-conviction disclosure of the lifters, and the particles on them, falls woefully short of undermining confidence in Smith's murder convictions.

Smith introduced the report of an expert he had retained for the hearings ordered by the Pennsylvania Supreme Court. That expert opined that the quartz found on Reinert's feet was consistent with beach sand. However, that testimony is not inconsistent with Fielder's testimony. The quartz crystals could well have been beach sand. However, even if we completely credit Smith's expert's testimony, and completely ignore Fielder's statement that the two quartz crystals are "ubiquitous," and would have been found on anyone in the courtroom, all that is established is that two grains of sand that were found on Reinert's feet were consistent with beach sand. 16

_____

15. The court's quotation was taken from a site entitled, "DesertUSA Magazine." See http://www.desertusa.com/mag98/mar/index.html. The reference is consistent with information contained in the online version of the Encyclopedia Britannica. See http://www.britannica.com/bcom/eb/article/7/0,5716,63757+1,00.html.
16. It could be argued that the fact that only two grains of sand were found on Ms. Reinert's foot strongly suggests that she was not killed at the beach as one would expect to find far more than two grains of sand on a victim's foot if she were killed on a beach. Thus, the quartz crystals
are not unlike the proverbial "two edged sword" that cuts both for and against one's position.

Nevertheless, we can not allow disclosure decisions under Brady to turn upon whether the prosecution thinks evidence is consistent only with innocence. Here, the evidence did support the defense theory, and should have been disclosed.

19

As noted above, at Smith's criminal trial the Commonwealth introduced physical evidence that

inexorably tied Smith to Reinert's murder and the disappearance of her two children. Given the inquiry we must make under Brady, that evidence is worth repeating. The prosecution introduced the green pin with the white "P" that Beth Ann Brook saw Karen Reinert wearing when Karen was last seen, which the jury clearly believed was Karen's, and which was recovered under the front seat of Smith's car. A hair similar to Susan Reinert's was found inside Smith's home. Carpet fibers found on Reinert's body were similar to fibers from a carpet in the basement of Smith's home. A comb found under Reinert's body in her car contained the name of Smith's military unit, and was identical to combs found in Smith's home. Finally, Smith wrote a letter to his wife asking her to dispose of the incriminating carpet, and clean the interior of his car where Karen Reinert's pin was subsequently found.

Even if we ignore the hearsay statements that were improperly admitted against Smith, and even if we also ignore Martray's suspect testimony, our confidence in Smith's convictions is not diminished in the least. We remain firmly convinced of the integrity of those guilty verdicts. Accordingly, there was no due process violation for purposes of Smith's S 1983 claim. A Brady violation is established "by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Kyles, at 435. The two grains of quartz can not possibly offset the evidence of Smith's guilt that was presented to the jury that convicted him of murdering Susan Reinert and her two children. Smith has not come close to demonstrating "a reasonable probability that the[criminal] jury would have returned a different verdict if the information had been disclosed. . . ." Buehl v. Vaughn, 166 F.3d 163, 181 (3d Cir. 1999). Accordingly, he has not established that withholding Brady material resulted in a Brady violation, and we can therefore dispose of Smith's remaining issues with only brief discussion.

In light of our discussion, Smith's claim that the District Court erred by not finding as a matter of law that the lifters

were material and exculpatory is meritless. His assertion that the District Court erred in submitting that issue to the jury is therefore also meritless.17 In fact, that argument elevates form over substance because the District Court expressly found that "had the question been left to the court, we would have agreed with the jury's conclusion." 30 F. Supp.2d at 479. Therefore the District Court clearly stated that it would have decided that the lifters were immaterial as a matter of law. We disagree with that conclusion insofar as the court believed the lifters were not what is generically referred to as Brady material. However, we conclude the lifters were immaterial in that they would not have changed the outcome of Smith's criminal trial and their suppression was not, therefore, a Brady violation.

Smith's argument that the District Court erred in not deferring to the Pennsylvania Supreme Court's decision on the Brady issue or, in the alternative, that it should have allowed the jury to learn of that decision is also meritless. Smith claims that the Pennsylvania Supreme Court was "the only court which conducted a full review of the evidence presented at plaintiff 's criminal trial, and reviewed the entire evidentiary record regarding the lifters,[and] concluded that they were Brady evidence." Smith's Br. at 18. His argument refers to the Pennsylvania Supreme Court's holding that prosecutorial misconduct barred Smith's retrial. See 615 A.2d 321 (Pa. 1992).

Smith misstates the Pennsylvania Supreme Court's decision. That court never performed an analysis to determine if the Commonwealth's unethical conduct constituted a Brady violation. Rather, the Court focused upon whether the Commonwealth's conduct during Smith's murder trial (including the prosecutor's failure to disclose Martray's pending criminal charges), the continued suppression of favorable evidence while arguing in favor of Smith's execution during the appellate process, and the Commonwealth's excoriation and investigation of Corporal Balshy, constituted the kind of egregious prosecutorial overreaching that precluded Smith's retrial under the

_____

17. As noted above, this is merely a restatement of the preceding argument.

21

double jeopardy clause of the Pennsylvania Constitution. The Court answered that inquiry in the affirmative, but it never inquired into whether the Commonwealth's conduct undermined confidence in the murder convictions, and it never held that the Commonwealth's conduct amounted to a Brady violation.

Smith also argues that the doctrine of offensive collateral estoppel barred relitigation of the materiality of the lifters because their materiality and exculpatory nature had already been established by the Pennsylvania Supreme Court. However, Smith could not prevail on this argument even if the Pennsylvania Supreme Court had decided that issue as Smith says. As we have stated, the Pennsylvania Supreme Court did not address the due process component of a Brady violation. Therefore, the doctrine does not apply.18

_____

18. Here, several factors preclude the application of offensive collateral estoppel. Neither Holtz, nor Dove, nor Yatron made the decision not to disclose the existence of the lifters. Although Dove waited one week before he told anyone about the lifters, he did eventually turn them over to Holtz who immediately informed Guida. It was Guida, the prosecutor, who made the decision not to disclose the lifters to Smith's counsel. At the time he made that decision Guida represented the Commonwealth's interests, not the interests of Holtz, Dove or Yatron. However, Guida, as prosecutor, has absolute immunity from liability in Smith's S 1983 action so long as he was functioning in his prosecutorial capacity when he made that decision. Imbler v. Pachtman, 424 U. S. 409 (1976); see also Buckley v. Fitzsimmons, 509 U. S. 259 (1993) ( prosecutor has absolute immunity in S 1983 action for the initiation and pursuit of a criminal prosecution, including presentation of the state's case at trial). Since Guida has absolute immunity, the State Troopers and Attorney General personnel are the only Commonwealth actors Smith can sue under S 1983. See Smiddy v. Varney, 665 F.2d 261, 266–67 (9th Cir. 1981).

The Pennsylvania Supreme Court did not blame any one individual for the unethical misconduct that it found. Instead, it cast blame upon "the Commonwealth" in general, and "the prosecutor" in particular. Smith's civil action is against the defendants in their individual capacities, but they are not in privity with the government in a prior criminal prosecution when sued in their individual capacities. See Morgan v. Gertz, 166 F.3d 1307, 1309 (10th Cir. 1999); see also 18 CHARLES A. WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND

PROCEDURE S 4458, at 508 (1981) ("[A] judgment against a government does not bind its officials in subsequent litigation that asserts a personal

Finally, Smith makes three arguments in support of his contention that the District Court erred in denying his motion for a new trial. Smith argues that he is entitled to a new trial because the jury's findings in favor of Dove and Yatron are against the weight of the evidence. As a general rule, "[w]e review the district court's order ruling on a motion for a new trial for abuse of discretion unless the court's denial is based on the application of a legal precept, in which case the standard of review is plenary." Rotondo v. Keene Corp., 956 F.2d 436, 438 (3d Cir. 1992)."[T]he district court ought to grant a new trial on the basis that the verdict was against the weight of the evidence only where a miscarriage of justice would result if the verdict were to stand." Klein v. Hollings, 992 F.2d 1285, 1290 (3d Cir. 1993). For the reasons we have previously discussed, the jury's findings here clearly do not result in a miscarriage of justice, and Smith's argument to the contrary is frivolous.

Absent a showing that the suppression of the lifters constituted a Brady violation, Dove and Yatron are not liable to Smith under S 1983. Equally without merit is Smith's argument that the District Court erred by permitting the defendants here to introduce certain inculpatory evidence that supported the Commonwealth's criminal case against him. Smith argues that the only relevant inquiry at his S 1983 trial was whether the defendants intentionally suppressed evidence. However, as we have already explained, this misstates the relevant inquiry.

> Essentially, . . ., the question we must resolve is: when viewed as a whole and in light of the substance of the prosecution's case, did the government's failure to provide . . . Brady . . . evidence to the defense . . . lead to an untrustworthy guilty verdict . . .?

_____

liability against the officials."). Therefore, the District Court did not abuse its discretion in refusing to apply the doctrine of offensive collateral estoppel. Parklane Hosiery Co., Inc. v. Shore, 439 U.S. 322, 331
(1979). (The application of the doctrine of collateral estoppel is within the
"broad discretion" of the trial court.)

U.S. v. Pelullo, 105 F.3d 117, 123 (3d Cir. 1997)(emphasis added). Here, the answer is a resounding "no." There is nothing untrustworthy about Smith's conviction for murder. Therefore, even if the District Court erred in allowing additional evidence of guilt to be introduced during Smith's civil trial, the error was harmless.

Finally, Smith argues that the District Court erred in not granting his motion to bifurcate his trial into liability and damages phases. Smith apparently actually asked the court to "trifurcate" the trial into three phases to separately determine the "due process violation, injury, and damages." 30 F. Supp. 2d at 480. We review the court's refusal to "bifurcate" the trial for an abuse of discretion. Barr Laboratories, Inc. v. Abbott Laboratories, 978 F.2d 98, 105 (3d Cir. 1992). Smith has not established the court's determination of the best way to proceed was an abuse of discretion. Moreover, inasmuch as he did not establish a Brady violation, we fail to see how he was prejudiced by the court's decision to deny Smith's request to divide the trial into three separate phases.

IV.

Accordingly, we will affirm the order of the District Court. Our confidence in Smith's convictions for the murder of Susan Reinert and her two children is not the least bit diminished by consideration of the suppressed lifters and quartz particles, and Smith has therefore not established that he is entitled to compensation for the unethical conduct of some of those involved in the prosecution.

A True Copy:
Teste:

       Clerk of the United States Court of Appeals
       for the Third Circuit

24